## IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **Kent Gard,** | **Case No. 1:20cv125** |
| **Plaintiff,** | |
| **-vs-** | **JUDGE PAMELA A. BARKER** |
| **Grand River Rubber & Plastics Company,** | **MEMORANDUM OPINION & ORDER** |
| **Defendant** | |

Currently pending is Defendant Grand River Rubber & Plastics Company's (1) Motion for Summary Judgment (Doc. No. 63); and (2) Motion to Strike the Declaration of Kent Gard (Doc. No. 77.)  Plaintiff Kent Gard filed Briefs in Opposition to both Motions, to which Defendant replied. (Doc. Nos. 71, 74, 78, 82, 86.)  For the following reasons, Defendant's Motion to Strike (Doc. No. 77) is DENIED.  Defendant's Motion for Summary Judgment (Doc. No. 63) is GRANTED IN PART and DENIED IN PART, as set forth herein.

## I.      Facts

Defendant Grand River Rubber & Plastics Company (hereinafter "Defendant" or "Grand River") is an Ashtabula, Ohio company that manufactures tubular rubber products, including lathe cut gaskets, drum and pail gaskets, seals, and vacuum sweeper belts.  (Deposition of Donald Chaplin (Doc. No. 64-1) at Tr. 18-21.)  Grand River has approximately 200 employees and is 100% employee owned.  (*Id*. at Tr. 15, 24.)  Donald Chaplin has served as Grand River's President since 2014.  (*Id*. at Tr. 42-43.)  He is also the company's Treasurer and a member of the Board.  (*Id*. at Tr. 47.)

In October 2016, Grand River offered Plaintiff Kent Gard (hereinafter "Plaintiff" or "Gard") the position of Manufacturing Manager of the Lathe Cut Division.[1]  (Deposition of Kent Gard (Doc. No. 64-3) at Tr. 84.)  Gard was sixty-four (64) years old at the time of his hire.  (*Id*. at Tr. 7.)  Although he does not possess a bachelor's degree, Gard has over thirty (30) years of manufacturing management experience.  (*Id.* at Tr. 7, 80.)  Gard accepted the offer and began his employment with Grand River on January 3, 2017.  (*Id*. at Tr. 80, 102.)  He reported directly to then-Vice President of Operations, Jason Brand, who reported to Chaplin.  (*Id*.)  *See also* Deposition of Jason Brand (Doc. No. 64-2) at Tr. 21.

As part of his compensation package, Gard received health insurance through Grand River. (Chaplin Depo. at Tr. 121-122; Gard Depo. at Tr. 162-163.)  At all times relevant hereto, Grand River's health insurance plan was self-funded with stop-loss coverage up to a certain amount.[2] (Chaplin Depo. at Tr. 144-145.)  Grand River works with a broker, USI Insurance Services, LLC ("USI") to help manage its health insurance plan and for assistance in finding and/or renewing health insurance plans for its employees.  (*Id*. at Tr. 143-144.)  *See also* Deposition of Matthew Baird (Doc.

---

[1] According to Grand River's Job Description for this position, the "essential job functions" of the Manufacturing Manager position were to "promote and maintain a safe work environment; understand company short and long term objectives and generate contributions to and meet those objectives; facilitate, establish, and maintain a working relationship between manufacturing, quality assurance and engineering to promote continuous improvement and timely completion of projects; set productivity goals by analyzing productivity data and monitoring throughput efficiencies, develop an action plan and drive improvements to achieve these goals; ensure demand is met based upon sales forecast and drives to achieve the goal of 100% on-time delivery; develop and implement strategies for reducing waste; assist in employee training and development; and other functions as assigned."  *See, e.g.*, Chaplin Depo. Exh. 8 (Doc. No. 64-1 at PageID# 606-607).

[2] In this type of plan, employers are responsible for medical claims up to a so-called "stop loss limit."  (Deposition of Matt Baird (Doc. No. 65-1) at Tr. 31.)  Once claims exceed that stop loss limit, the cost gets passed on to the stop loss insurer.  (*Id*.)  In Grand River's case, the stop loss limit in 2017 and 2018 was $75,000.  (Chaplin Depo. at Tr. 201.)  In 2019, Grand River increased its stop loss limit to $100,000.  (*Id*.)  When claimants incur high healthcare costs that lead to claims against stop loss insurance, such claims can increase the cost of renewing a stop loss plan.  *See* Deposition of Lisa Castle (Doc. No. 64-4) at Tr. 53-54, 57; Baird Depo. at Tr. 33.

No. 65-1) at 16-18.  Chaplin is responsible for making the final decision regarding Grand River's health insurance plan.  (Deposition of Lisa Castle (Doc. No. 64-4) at Tr. 47-48.)  In 2017, Grand River's stop loss insurer was Anthem.  (*Id*. at Tr. 44.)

In early February 2017 (approximately six weeks after starting at Grand River), Gard suffered a heart attack.  (Gard Depo. at Tr. 103.)  He was hospitalized at the Cleveland Clinic for the next three months.  (*Id*. at Tr. 108.)  During his stay at the Cleveland Clinic, Gard suffered acute kidney injury and was placed on dialysis.[3]  (*Id*. at Tr. 158-159.)  *See also* Expert Report of Vito Campese, M.D. (Doc. No. 71-7) at PageID# 2295.  He was transferred to a rehab facility in Ashtabula and was eventually discharged in late April/early May 2017.  (Gard Depo. at Tr. 109-111.)  Gard remained on dialysis until June 30, 2017.  (Doc. No. 71-7 at PageID# 2295.)

Gard returned to work at Grand River on July 18, 2017.  (Gard Depo. at Tr. 112.)  During the time he was out on medical leave, Grand River paid Gard his full pay and did not require him to use his accrued vacation time.  (*Id*. at Tr. 113.)  Gard acknowledged that, at the time, he stated that he had "never been treated better."  (*Id*. at Tr. 116.)  Gard returned to work in a full-time capacity.  (*Id*. at Tr. 117.)  Upon his return, he did not request any accommodations relating to his health, other than the need to occasionally go to medical appointments.  (Brand Depo. at Tr. 206-207.)

On August 10, 2017, Chaplin had a conversation with Gard about his health care insurance. (Gard Depo. at. Tr. 174-176.)  Shortly afterwards, Gard wrote the following summary of this conversation:

> On or about 8/10/2017 Donny Chaplin came into my office area and said he had something to show me. I proceeded to follow him outside the office area into the hallway by the time clock where he stopped and said he didn't have anything to show

---

[3] Gard already had a history of Chronic Kidney Disease ("CKD") at the time of his heart attack. *See* Expert Report of Vito Campese, M.D. (Doc. No. 71-7) at PageID# 2295.

3

> me but rather he wanted to talk to me away from everyone else. He proceeded to tell me how expensive health care costs were for the company and he needed to do something to alleviate the recent health care costs. Donny also told me that my recent heart attack and subsequent bypass surgery was a major contributor to the excessive health care costs the company was exposed too [sic]. Donny stated that he was sure I did not want the company to not be successful. He then asked me if I had health insurance available through my wife's employer. He also asked if I had considered Medicare for insurance coverage. Donny then said that if I would waiver [sic] my insurance coverage with [Grand River] that he would adjust my salary to cover the additional costs through my wife's employer. I told him that the coverage my wife and I could get through her employer was not as good as the coverage I was getting through [Grand River]. I also told him that with my current health conditions that I would not be able to get insurance through another provider. I told him I would not waiver [sic] my rights to insurance coverage through [Grand River]. Donny ended the conversation by saying we would stay in touch concerning health care going forward.

(Gard Depo. Exh 4 (Doc. No. 73-3) at PageID# 2839.)[4] *See also* Gard Depo. at Tr. 174-177. Chaplin explained that the reason he had this conversation with Gard was because of the high cost of the claims that Gard had incurred in 2017. (Chaplin Depo. at Tr. 175-176.)

Throughout 2017 and 2018, Gard continued to work full-time as Manufacturing Manager of the Lathe Cut Division. Gard testified that he was not provided any negative feedback and, in fact, was regularly told that he was "doing a good job." (Gard Depo. at Tr. 153; Gard Decl. (Doc. No. 73-1) at ¶¶ 5-6.) Gard's supervisor, Jason Brand, stated that Gard met all expectations and successfully performed his job. (Brand Depo. at Tr. 38, 53.) In particular, Brand testified that, under Gard's management, the Lathe Cut Division became more cost-effective, efficient, and profitable. (*Id*. at Tr. 47-50, 53-54, 58, 65-66.) Brand stated that he gave Gard a positive performance evaluation in

---

[4] Brand also testified that, in August 2017, Chaplin told him that "Kent's health care costs from his catastrophic event were very high and he [Chaplin] would like to ask Kent to move off of our health insurance and attempt to get on his wife's insurance and I stated that I didn't think that was a good idea." (Brand Depo. at Tr. 70.) *See also* Brand Declaration (Doc. No. 71-3) at ¶ 8.) Brand further testified that Gard later told Brand that Chaplin had asked him about the possibility of switching to his wife's insurance. (Brand Depo. at Tr. 80.) Brand testified that Gard was upset and indicated he was going to talk to a lawyer. (*Id*.)

4

January 2019 and, further, that Gard received regular pay raises and bonuses during his employment at Grand River.[5]  (*Id*. at Tr. 66-68.)  *See also* Gard Decl. (Doc. No. 73-1) at ¶¶ 7-9.

Meanwhile, Chaplin testified that he knew that Gard "had an issue with his kidneys" and that he (Chaplin) communicated with USI regarding the cost of Gard's health care expenses relating to this condition.  (Chaplin Depo. at 161-162, 179-180.)  For example, in September 2017, Chaplin emailed Matthew Baird at USI, asking "[d]id you ask Anthem about the stop loss renewal if we take Kent Gard off the plan?" (Chaplin Depo. at Tr. 154; Chaplin Depo. Exh. 26 (Doc. No. 64-1 at PageID# 663.))  Baird responded that Anthem was "absolutely willing to work on getting the rates down if we can give them a definitive yes" on Gard (and one other "high-cost claimant") leaving the plan, noting that "[i]t will also go a long way in helping with the other [insurance] carriers."  (Chaplin Depo. at Tr. 158-159; Chaplin Depo. Exh. 26 (Doc. No. 64-1 at PageID#662.))   In or around November 2017, Chaplin testified that he was told by Brand that Gard was back on dialysis and was going to be needing a kidney transplant.  (Chaplin Depo. at Tr. 194-197.)  Around this same time, Chaplin was concerned about increases in Grand River's health care expenses that were "too large for the company to absorb." (*Id*. at Tr. 187-188.) *See also* Brand Depo. at Tr. 77-78.  Chaplin reached out to Baird in late November 2017, seeking to determine whether Gard was on a kidney transplant list.  (Chaplin Depo. at Tr. 192-93; Chaplin Depo. Exh. 32 (Doc. No. 64-1 at PageID# 678.))  Grand River ultimately switched its stop loss insurer from Anthem to Medical Mutual of Ohio ("MMO") in 2018.[6]  (Castle Depo. at Tr. 44-45; Chaplin Depo. at Tr. 190.)

---

[5] Both Brand and Chaplin testified that Gard was never given any sort of written warning or negative performance evaluation.  *See* Brand Depo. at Tr. 40-41; Chaplin Depo. at Tr. 130.

[6] Baird testified that, when it was time to renew Grand River's stop loss insurance at the end of 2017, Anthem quoted a significantly higher stop loss premium. (Baird Depo. (Doc. No. 65-1) at Tr. 79-81.)  Specifically, Baird testified that

In July and August 2018, Chaplin attempted to determine whether Gard might qualify for Medicare due to his kidney condition.  Specifically, on July 23, 2018, Chaplin emailed Baird regarding the possibility of having Gard's kidney condition diagnosed as end stage renal disease ("ESRD"), as Chaplin believed that Medicare would cover the cost of Gard's kidney transplant once Gard had that diagnosis for a certain length of time.[7]  (Chaplin Depo. at Tr. 202-203; Chaplin Depo. Exh. 33 (Doc. No. 64-1 at PageID# 679).))  On July 30, 2018, Chaplin emailed Baird again, this time asking him for information that could be provided to Gard that "would show that Medicare pays primary after" a certain time period.  (Chaplin Depo. Exh. 36 (Doc. No. 64-1 at PageID# 685).))  In that email, Chaplin advised Baird that Gard "will then talk to the doctor to see about his original diagnosis date." (*Id.*)

In addition, at some point in late July or early August 2018, Chaplin spoke with Gard about the possibility of switching to Medicare.[8]  (Chaplin Depo. at Tr. 216.)  According to Gard, Chaplin "instructed [him] directly to make an appointment with the Social Security Administration ('SSA')

---

Anthem's quote for 2018 represented an increase of 48.14% in the fixed cost of the health plan from 2017 to 2018. (*Id.* at Tr. 80.)  When asked why Anthem quoted such a significant increase in fixed cost expense, Baird explained as follows: "They would have done that because they paid out more in stop-loss insurance than they received in premium.  So they would just be looking for an increase in premium."  (*Id.*)

[7] Chaplin testified that his understanding was that, if an individual has suffered from ESRD for 30 months, he would then become eligible for Medicare to become his primary insurance.  (Chaplin Depo. at Tr. 203-204.)  In his emails to Baird on July 23, 2018, Chaplin advised Baird that Gard was having a port placed into his arm "in the near future" and asked whether that would need a pre-approval.  Baird responded that it likely would, to which Chaplin replied as follows: "Thanks.  Maybe we can push for the ESRD [diagnosis] because he was definitely on dialysis before and now the kidneys are failing again."  Baird then stated that he would "push this and keep the conversation going." *See* Chaplin Depo. at Tr. 202-204; Chaplin Depo. Exh. 33 (Doc. No. 64-1 at PageID#s 679-680).

[8] During this same general time period, Gard was assigned responsibility for managing Grand River's Secondary Operations division, in addition to managing the Lathe Cut Division.  (Brand Depo. at Tr. 52-54; Chaplin Depo. at Tr. 209.)  Brand testified that it was his idea to transfer the Secondary Operations Division to Gard because Gard had been doing "such a good job."  (Brand Depo. at Tr. 53-54.)  Chaplin testified that Secondary Operations was only transferred to Gard because he had "time on his hands." (Chaplin Depo. at Tr. 284-285.)

6

office and see whether the Medicare program could be the primary payer for my health claims." (Gard Decl. at ¶ 21.) *See also* Gard Depo. at Tr. 254. Chaplin further advised Gard that "[w]e may be in better shape with Medicare if your [ESRD] diagnosis was back in 2016 or before." (Chaplin Depo. Exh. 37 (Doc. No. 64-1 at PageID# 687.))

Gard subsequently met with Social Security in September 2018. (Gard Depo. at Tr. 255.) *See also* Chaplin Depo. Exh. 37 (Doc. No. 64-1 at PageID# 687.) After speaking with Social Security representatives, Gard became concerned that switching to Medicare could result in him having to change doctors. (Gard Depo. at Tr. 179-180, 255-256.) He, therefore, decided to remain on Grand River's health insurance plan and not to switch to Medicare. (*Id*. at Tr. 183, 256.) Gard advised Chaplin of his decision in October 2018. (*Id*. at Tr. 256.)

Around the same time, USI was having some difficulty locating stop loss coverage quotes for Grand River due, in part, to Grand River's "large claim history." (Chaplin Depo. at Tr. 244-245.) On October 10, 2018, Grand River's Cost Reduction Analyst, Lisa Castle, sent an email to Chaplin and Baird in which she provided an update regarding Grand River's high-cost claimants. (Castle Depo. at Tr. 136; Castle Depo. Exh. 27 (Doc. No. 64-4 at PageID# 1279.)) In this update, Castle identified Gard as the first of five high-cost claimants and noted that Plaintiff is "Medicare eligible as of last year—still on our plan." (Castle Depo. Exh. 27 (Doc. No. 64-4 at PageID# 1279.)) Another so-called "high claimant report" indicated that Gard's health care expenses in 2017 represented the highest one-year expense of any employee at Grand River.[9] *See* Chaplin Depo. at Tr. 232; Chaplin Depo. Exh. 39 (Doc. No. 64-1 at PageID# 691); Castle Depo. at Tr. 151; Castle Depo. Exh. 29 (Doc.

---

[9] According to this report, Gard's total health care costs for 2017 were over $400,000. (Castle Depo. Exh. 29 (Doc. No. 64-4 at PageID#1285.)) *See also* Chaplin Depo. at Tr. 235; Chaplin Depo. Exh. 40 (Doc. No. 64-1 at PageID# 693.)

No. 64-4 at PageID# 1285.))  In an effort to control costs, Grand River increased its stop loss threshold from $75,000 to $100,000 at the beginning of 2019.  (Castle Depo. at Tr. 157-158.)

On January 25, 2019, Chaplin sent an email to a number of Grand River's managerial employees (including Brand, Gard, and the managers of Grand River's other divisions) regarding Grand River's "2019 Targets and Objectives."  (Chaplin Depo. at Tr. 299-300; Chaplin Depo. Exh. 52 (Doc. No. 64-1 at PageID#s 767-769.))  In this email, Chaplin identifies specific projects for 2019 and then lists names next to each project identifying the "key people" to be involved in each project. (*Id*.)  Chaplin did not assign any projects to Gard in this email, despite the fact that there were several specific projects listed for Gard's own division.  (*Id*.)  *See also* Gard Depo. at Tr. 144-149.  During deposition, Chaplin confirmed that (aside from Grand River's inventory supervisor) Gard was the only person who was not assigned a project for 2019.[10]  (Chaplin Depo. at Tr. 299-300.)

In mid-April 2019, Gard told Brand that that he needed a kidney transplant and that he was in a new program at the Cleveland Clinic to get a Hepatitis-C infected kidney.  (Brand Depo. at Tr. 99; Gard Decl. at ¶¶ 27, 28.)  Gard explained that he "made this election to speed up the timeframe for me to receive an available kidney." (Gard Decl. at ¶ 27.)  Gard advised Brand that he might have to leave abruptly at some point within the next few months to get his transplant.  (*Id*. at ¶ 28.)  *See also* Brand Depo. at Tr. 99; Gard Depo. at Tr. 198.

In May 2019, Chaplin informed Brand that Grand River was "going to reorganize" and that he was going to terminate Gard's employment.  (Brand Depo. at Tr. 101.)  Brand testified that he was

---

[10] Brand testified that, around this time period, Chaplin told him that he had "figured out a way that Kent can go on Medicare to get his kidney transplant."  (Brand Decl. (Doc. No. 71-3) at ¶ 13.) Brand testified that, at this time, he did not know that Gard was going to have a kidney transplant and Chaplin "did not tell him how he knew" this information. (*Id*.)  *See also* Brand Depo. at Tr. 96-98.

8

surprised by this decision because there had been "no previous talks of any type of issues with Kent's employment or his performance in general." (*Id*. at Tr. 102.) Brand further testified that he told Chaplin that he opposed the decision because Gard's division had shown "the most improvement of any division," Gard had reduced costs, and "everything is running fairly smoothly." (*Id*. at Tr. 101.) According to Brand, Chaplin indicated that the decision to terminate Gard's employment was not due to performance issues but because Grand River had decided to "reorganize" and bring in a new individual, Keith Wyatt,[11] to oversee all Grand River's product lines. (*Id.* at Tr. 102.)

Chaplin proceeded to terminate Gard's employment on May 10, 2019. (Gard Depo. at Tr. 199-200.) Gard testified that, during his termination meeting, Chaplin indicated he was hiring Wyatt to be chief operating officer and that Grand River "was taking the company in a different direction." (*Id*. at Tr. 201-204.) Gard further testified that Chaplin informed him that his termination had nothing to do with his job performance and, in fact, that Chaplin told him his "performance was excellent."[12] (*Id*. at Tr. 258.) On June 11, 2019, Chaplin sent a letter to Gard in "follow up" to the termination meeting. (Chaplin Depo. Exh. 51 (Doc. No. 64-1 at PageID# 766.)) Therein, Chaplin states that Grand River "has restructured and eliminated the position of Manufacturing Manager—Lathe cut. Due to this restructuring, you are being placed on permanent lay-off." (*Id.*)

Wyatt began his employment as Grand River's COO in July 2019. (Chaplin Depo. at Tr. 292.) He was fifty-nine (59) years old at the time. *See* Chaplin Depo. Exh. 65 (Doc. No. 64-1 at

---

[11] Mr. Wyatt had been serving as a consultant to Grand River since January 2019. (Chaplin Depo. at Tr. 289.)

[12] During his deposition, however, Chaplin testified that he did, in fact, have concerns about Gard's job performance. (Chaplin Depo. at Tr. 270, 274.) Specifically, Chaplin testified that Gard did not have the respect of the managerial staff reporting to him, had not "really done an outstanding job" in certain respects, and had fallen asleep in meetings on several occasions. (*Id.* at Tr. 270, 279, 283, 286-287.)

PageID# 821.)  Under the new reorganization, Wyatt reported directly to Chaplin, while Brand (who previously had reported directly to Chaplin) reported to Wyatt.  (Chaplin Depo. at Tr. 292.)  Wyatt assumed Brand's responsibilities for managing the Drum & Pail Division and Project Engineering Manager.  (Brand Depo. at Tr. 124-126; Chaplin Depo. at Tr. 344-347.)  Brand was assigned responsibility for overseeing Gard's former division, i.e., the Lathe Cut Division.  (Chaplin Depo. at Tr. 343-344; Brand Depo. at Tr. 125-126, 132-133.)  He was also tasked with overseeing Secondary Operations, which Gard had been managing since mid-2018.  (Chaplin Depo. at Tr. 343-344; Brand Depo. at Tr. 126.)  Brand was forty-four (44) years old at the time.  (Brand Depo. at Tr. 7.)

Brand left Grand River in January 2020.[13]  (Brand Depo. at Tr. 150-151, 155.)  In March 2020, Grand River posted the position of Lathe Cut Production Manager.  (Chaplin Depo. at Tr. 359.)  This position was filled by an inside sales employee, Bobby Nelson.  (*Id*. at Tr. 363.)  Mr. Nelson was forty-five (45) years old at the time he was hired for this position.  *See* Castle Depo. Exh. 8 (Doc. No. 64-4 at PageID# 1233.)

In February 2020, Gard successfully underwent a kidney transplant.  (Gard Decl. at ¶ 33.)

## II.  Relevant Procedural History

On January 20, 2020, Gard filed a Complaint in this Court against Grand River alleging the following claims: (1) age discrimination under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*. and state law (Counts One and Two); (2) disability discrimination

---

[13] Brand testified that, in October or November 2019, Grand River offered him a different position that he felt involved reduced responsibilities and would result in a reduction of pay.  (Brand Depo. at Tr. 156-157.)  Brand testified that, on January 3, 2020, Chaplin told him that "you're either accepting the lower position with lower pay or you're resigning."  (*Id*. at Tr. 157.)  On January 6, 2020, Brand advised Chaplin that he would not be accepting the "lower position," after which Chaplin told him not to return to the facility.  (*Id*. at Tr. 155, 158.)  Chaplin testified that Brand resigned after having been given the option of resigning or staying at Grand River under a different job description.  (Chaplin Depo. at Tr. 337.)

under the American with Disabilities Act ("ADA"), 42 U.S.C. § 12101 and state law (Counts Three and Four); (3) retaliation under the ADA and state law (Counts Five and Six); and (4) interference and retaliation under the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C. § 1140. (Doc. No. 1.)  Grand River filed an Answer on March 19, 2020.  (Doc. No. 9.)

On March 17, 2021, Grand River filed a Motion for Summary Judgment with respect to all of Gard's claims.  (Doc. No. 63.)  On April 16, 2021, Gard filed redacted and unredacted versions of his Brief in Opposition to Grand River's Motion for Summary Judgment.  (Doc. Nos. 71, 74.)  In support of his Brief in Opposition, Gard filed a Declaration of Kent Gard, dated April 13, 2021.  (Doc. No. 73-1.)

On April 30, 2021, Grand River filed its Reply Brief in Support of Motion for Summary Judgment, as well as a Motion to Strike Gard's Declaration.  (Doc. Nos. 77, 78.)  Gard opposed Grand River's Motion to Strike (Doc. No. 82) and was granted leave to file a sur-reply in response to Grand River's Reply Brief.  (Doc. No. 81-1.)  On May 19, 2021, Grand River filed a Reply Brief in support of its Motion to Strike.  (Doc. No. 86.)  Thus, Defendant's Motions to Strike and for Summary Judgment are ripe and ready for resolution.[14]

## III.    Standard of Review

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A dispute is 'genuine' only if based on evidence upon which a reasonable jury could return a verdict in

---

[14] Gard has also filed a Motion for Sanctions relating to certain discovery disputes that occurred between the parties. (Doc.  No. 61.)  The Court will address that motion in a separate Memorandum Opinion & Order.

favor of the non-moving party." *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479, 487 (6th Cir. 2006). "Thus, 'the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.'" *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). A fact is "material" only "if its resolution might affect the outcome of the suit under the governing substantive law." *Henderson*, 469 F.3d at 487.

At the summary judgment stage, "[a] court should view the facts and draw all reasonable inferences in favor of the non-moving party." *Pittman v. Experian Info. Solutions, Inc.,* 901 F.3d 619, 628 (6th Cir. 2018). In addition, "the moving party bears the initial burden of showing that there is no genuine dispute of material fact." *Ask Chems., LP v. Comput. Packages, Inc*., 593 Fed. Appx 506, 508 (6th Cir. 2014). The moving party may satisfy this initial burden by "identifying those parts of the record which demonstrate the absence of any genuine issue of material fact." *Lindsey v. Whirlpool Corp*., 295 Fed. Appx 758, 764 (6th Cir. 2008). "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial," the moving party may also "meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Id*. (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the moving party satisfies its burden, "the burden shifts to the non-moving party who must then point to evidence that demonstrates that there is a genuine dispute of material fact for trial." *Ask Chems*., 593 Fed. Appx at 508-09. "[T]he nonmoving party may not simply rely on its pleading, but must 'produce evidence that results in a conflict of material fact to be solved by a jury.'" *MISC Berhad v. Advanced Polymer Coatings, Inc*., 101 F. Supp. 3d 731, 736 (N.D. Ohio 2015) (quoting *Cox,* 53 F.3d at 150).

## IV. Motion to Strike Declaration of Kent Gard (Doc. No. 77)

The Court first addresses Grand River's Motion to Strike Gard's Declaration, dated April 13, 2021, which was submitted in support of his Brief in Opposition to Grand River's Motion for Summary Judgment. (Doc. No. 77.) Grand River asserts that Paragraphs 32, 22, 31, and 34 of Gard's Declaration improperly contradict his previous deposition testimony in order to create a genuine issue of material fact. (*Id.*) Grand River asserts that Gard's alleged attempt to change his deposition testimony after the close of discovery is improper and severely prejudicial. (*Id.*) In response, Gard argues that his Declaration was properly submitted under Fed. R. Civ. P. 56(c) as a "legitimate effort to supplement the summary judgment record." (Doc. No. 82 at p. 1.) He asserts that his Declaration does not contradict his previous deposition testimony or otherwise create a "sham issue of material fact." (*Id.* at p. 2.) Rather, Gard maintains that his Declaration clarifies certain issues that he was confused about during deposition and provides information that was not elicited or addressed. (*Id.* at pp. 3-9.)

The Sixth Circuit has repeatedly indicated that "[a] party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts [his] earlier deposition testimony." *Reid v. Sears, Roebuck and Co.*, 790 F.2d 453, 460 (6th Cir. 1986). *See also Johnson v. Ford Motor Company*, 13 F.4th 493, 501 (6th Cir. 2021); *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 842 (6th Cir. 2021); *Aerel, S. R. L v. PCC Airfoils, LLC*, 448 F.3d 899, 905 (6th Cir. 2006). In determining an affidavit's admissibility at summary judgment, the district court must first consider "whether the affidavit 'directly contradicts the nonmoving party's prior sworn testimony,'" and, "[i]f so, absent a persuasive justification for the contradiction, the court

13

should not consider the affidavit." *Reich v. City of Elizabethtown*, 945 F.3d 968, 976 (6th Cir. 2019) (quoting *Aerel, S.R.L.*, 448 F.3d at 908).

Sixth Circuit precedent suggests "a relatively narrow definition of contradiction." *Briggs v. Potter*, 463 F.3d 507, 513 (6th Cir. 2006). If a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party." *Aerel*, 448 F.3d at 907. "After all, deponents have no obligation to volunteer information the questioner fails to seek." *Reich,* 945 F.3d at 976. However, a deponent may not "duck [his] deposition" or "hold [his] cards in anticipation of a later advantage." *Powell-Pickett v. A.K. Steel Corp.*, 549 Fed. Appx 347, 353 (6th Cir. 2013). Where a deponent is "asked specific questions about, yet denie[s] knowledge of, the material aspects of [his] case, the material allegations in [his] affidavit directly contradict [his] deposition." *Id.*

"If the affidavit does not directly contradict prior sworn testimony, it should be stricken if it is 'an attempt to create a sham fact issue.'" *France v. Lucas*, 836 F.3d 612, 622 (6th Cir. 2016) (quoting *Aerel, S.R.L.*, 448 F.3d at 908). *See also Boykin*, 3 F.4th at 842 ("And even without a direct contradiction, [the rule] can also apply when the witness' affidavit is in tension with that prior testimony as long as the circumstances show that the party filed the affidavit merely to manufacture 'a sham fact issue.'") In determining whether an affidavit is attempting to create a sham issue of fact, courts consider the following factors: (1) "whether the affiant was cross-examined during his earlier testimony," (2) "whether the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence," and (3) "whether the earlier testimony reflects confusion [that] the affidavit attempts to explain." *Aerel, S.R.L.*, 448 F.3d

at 909 (alteration in original) (internal quotation marks and citation omitted).   *See also Johnson,* 13 F.4th at 501, fn 6.

### A.   Paragraph 32

Here, Grand River argues that the Court should strike Paragraph 32 of Gard's Declaration because it directly contradicts his previous deposition testimony.   During his deposition, Gard testified as follows:

> Q:   Did you have dinner with Lisa Castle when any charge with the EEOC was pending?
>
> A:   **I was not aware of any charges from EEOC**.
>
> Q:   **You're not aware of any charge being filed with EEOC?**
>
> A:   **No.**

(Gard Depo. at Tr. 251) (emphasis added).   In Paragraph 32 of his Declaration (which was filed in April 2021, after the close of fact discovery), Gard avers:

> 32.   On August 25, 2019, I signed the document attached hereto as Exhibit G, entitled Charge of Discrimination. Through my lawyers, I arranged for this document to be filed with the Equal Employment Opportunity Commission on August 29, 2019. I was never shown this document in my deposition but, if I had been, I would have recognized it.

(Gard Decl. (Doc. No. 73-1) at ¶ 32.)   Gard attaches a copy of his August 2019 EEOC charge to his Declaration as an Exhibit.   (Doc. No. 73-1 at PageID# 2780.)   This charge contains Gard's signature and is notarized.   (*Id.*)

Grand River argues that Gard's affidavit "completely changes [his] testimony that he did not file an EEOC charge."   (Doc. No. 77 at p. 3.)   Grand River further asserts that Gard's counsel failed to "put any document in front of Plaintiff for him to correct this information" but, rather, waited until after discovery closed to "change his answer."   (*Id.*)   In response, Gard argues that Paragraph 32 is

15

not directly contrary to his deposition testimony because Grand River never showed him the EEOC charge during deposition and, thus, he was never directly asked whether he had signed that document or arranged for it to be filed. (Doc. No. 82 at p. 3.) Gard further asserts that Paragraph 32 is not an effort to create a sham factual issue because it is clear from reading the deposition transcript that he was confused by defense counsel's questions and that his affidavit is merely seeking to clear up that confusion. (*Id*. at pp. 4-6.)

The Court declines to strike Paragraph 32 of Gard's Declaration. As an initial matter, the Court is not persuaded that Gard's Declaration is "directly contradictory" to his deposition testimony. Grand River did not show Gard a copy of the August 2019 EEOC charge during deposition and it is evident from context that Gard was confused by defense counsel's questions. In response to counsel's initial question regarding pending EEOC charges, Gard's response was that he was not aware of any charges "from EEOC," which suggests that Gard was confused about what a "charge" is and how and by whom it is filed. As counsel did not present Gard with the actual charge filed on August 25, 2019 or ask any further questions that might have clarified the situation, it is not evident that Gard understood what defense counsel was referring to when Gard was then asked if he was aware of "any charge being filed with EEOC." In light of this confusion, the Court is not persuaded that Gard's testimony directly contradicts his authentication of the charge that he filed, through his lawyers, in August 2019.

Moreover, even if Gard's Declaration did "directly contradict" his deposition testimony, a court need not strike a later sworn affidavit if the party opposing summary judgment "provides a persuasive justification for the contradiction." *Aerel, S.R.L.*, 448 F.3d at 908 (emphasis added). Here, Gard argues that he was confused by defense counsel's questions and asserts that, if he had been

16

shown his actual EEOC charge in deposition, he "would have recognized it." (Doc. No. 82 at p. 4; Doc. No. 73-1 at ¶ 32.)  Courts have considered later sworn affidavits where such affidavits supplement "potentially ambiguous or incomplete testimony" or address an issue that was not thoroughly or clearly explored in deposition.  *See, e.g., Aerel, S.R.L.*, 448 F.3d at 907 (allowing consideration of later sworn affidavit where it "fills a gap left open by the moving party and thus provides the district court with more information, rather than less, at the crucial summary judgment stage"); *Clinton River Cruise v. De La Cruz,* 213 Fed. Appx. 428, 435 (6th Cir. 2007) (declining to strike affidavits where they "offered a more complete explanation" and sought "to rectify possible confusion arising from" the witness' use of certain terminology).  *See also Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43 (2nd Cir. 2000) (finding that later sworn statement may be considered where it "addresses an issue that was not, or was not thoroughly or clearly, explored in the deposition"); *Miller v. A.J. Robins Co., Inc.*, 766 F.2d 1102, 1104 (7th Cir. 1985) (holding that an "inconsistent affidavit may preclude summary judgment . . . if the affiant was confused at the deposition and the affidavit explains those aspects of the deposition testimony . . .").

For similar reasons, the Court further finds that Paragraph 32 does not attempt to create a "sham fact issue."  *See Aerel, S.R.L.*, 448 F.3d at 908.  As noted *supra,* one of the factors to be considered in evaluating this issue is "whether the earlier testimony reflects confusion that the affidavit attempts to explain."  *Id.* at 909.  Here, and for all the reasons discussed above, the Court finds that Gard's earlier deposition testimony reflects confusion regarding defense counsel's questions about pending EEOC charges and that Paragraph 32 of Gard's Declaration seeks to explain that confusion.  Accordingly, and for all the reasons set forth above, Grand River's request to strike Paragraph 32 of Gard's Declaration is without merit and denied.

17

B.      **Paragraph 22**

Grand River next seeks to strike Paragraph 22 of Gard's Declaration on the grounds that it contradicts Gard's deposition testimony that he did not recall having any conversations with Chaplin about his health insurance in 2018.  (Doc. No. 77 at p. 4.)  Specifically, Grand River cites the following testimony by Gard in deposition:

> Q:      Did you have any discussions in the beginning of 2018 regarding your health insurance with anyone from Grand River Rubber?
>
> A:      I don't recall.
>
> Q:      Did Donny [Chaplin] approach you again about your health insurance in 2018?
>
> A:      I don't recall.

(Gard Depo. at Tr. 187-188.)  Paragraph 22 of Gard's Declaration states as follows:

> 22.     Attached hereto as Exhibit E is an email that Chaplin sent to me in which he reiterated his request that I discuss Medicare with the SSA office.  Until I was shown this document in my deposition, I was confused about the timeframe as to when Chaplin approached me regarding the SSA office.  I agreed to make the appointment as Chaplin requested, and I attended an appointment with the SSA office in September 2018.

(Gard Decl. (Doc. No. 73-1) at ¶ 22.)  Gard attaches as an Exhibit a copy of his August 2018 email exchange with Chaplin in which Gard states that he made an appointment with the Social Security office on September 18, 2018 to "look into the possibility of making Medicare my primary provider." (Doc. No. 73-1 at PageID# 2777.)

Gard argues that Paragraph 22 should not be stricken because, although Gard initially testified that he did not recall having any conversations with Chaplin about health insurance in 2018, he subsequently testified during deposition that he was confused about the timeframe and did, in fact, discuss this issue with Chaplin in August/September 2018.   (Doc. No. 82 at pp. 8-9.)  Gard argues

there is no basis for striking his Declaration under these circumstances, particularly where Chaplin acknowledged in his own deposition that he communicated with Gard about Medicare in 2018, the August 2018 email chain proves that this communication occurred, and Gard acknowledged in deposition that he was confused about the timeframe.  (*Id*.)

The Court agrees with Gard.  Reading Gard's deposition testimony on this issue in its entirety, it is apparent that Paragraph 22 does not directly contradict his testimony.  After initially testifying that he did not have any conversations with Chaplin about his health insurance in 2018, Gard was shown a copy of his August 2018 email exchange with Chaplin later in the deposition and testified that, in August 2018, Chaplin did, in fact, ask him to meet with Social Security in order to determine whether Medicare would cover his anticipated kidney transplant.  (Gard Depo. at Tr. 252-256.)  Gard's Declaration is consistent with his later deposition testimony.  Moreover, the Court notes that Chaplin himself was questioned about the August 2018 email exchange with Gard and acknowledged that Gard had informed him in August 2018 of his appointment with Social Security the following month.  (Chaplin Depo. at Tr. 218-227; Chaplin Depo. Exh. 37 (Doc. No. 64-1 at PageID# 687-688.))  Under these circumstances, the Court finds there is no basis for striking Paragraph 22 of Gard's Declaration.

### C.    Paragraph 31

Grand River next asks the Court to strike Paragraph 31 of Gard's Declaration.  (Doc. No. 77 at p. 5.)  Therein, Gard avers:

31.    I have since had the opportunity to review the job description for the position held by Keith Wyatt ("Wyatt"), [Grand River's] Chief Operating Officer, attached hereto as Exhibit F. I am qualified to hold Wyatt' s position. For example, I have previously overseen the operations and production of an entire plant, just as the Chief Operating Officer now does for [Grand River]. Plus, as Manufacturing Manager, I was already performing many [of] the job duties listed on the Chief Operating Officer job

description, like promoting [Grand River's] short- and long-term objectives, advancing safety, fostering continuous improvement, engendering working relationships between manufacturing, engineering, and sales, and assisting in employee training. There is no reason that I could not have served as [Grand River's] Chief Operating Officer.

(Gard Decl. (Doc. No. 73-1) at ¶ 31.) Grand River argues that the above paragraph is directly contradictory to Gard's deposition testimony that he (1) did not obtain a bachelor's degree; (2) is not a degreed engineer; and (3) has never held the job of vice president of operations. (Doc. No. 77 at p. 5.)

Grand River's argument is without merit. Gard's deposition testimony regarding his educational background and general work experience is not directly contradictory to Paragraph 31 of his Declaration. As noted above, if a party "was not directly questioned about an issue," a later affidavit on that issue simply "fills a gap left open by the moving party." *Aerel*, 448 F.3d at 907. See also *Reich*, 945 F.3d at 976 ("After all, deponents have no obligation to volunteer information the questioner fails to seek.") Here, Grand River does not direct this Court's attention to any specific deposition testimony wherein Gard was directly questioned about his qualifications for the COO position. Nor does Grand River identify any specific contradictions between such testimony and his Declaration. Accordingly, Grand River's request to strike Paragraph 31 is denied.

### D. Paragraph 34

Grand River next seeks to strike Paragraph 34 of Gard's Declaration, which provides as follows:

34. Attached hereto as Exhibit H is the job description for the Lathe Cut Production Manager, a new position formed by [Grand River] after my termination. Upon review of this job description, it appears that I did essentially all of these job functions as the Manufacturing Manager of the Standard Lathe Cut division. After, I was performing all the job duties listed in the Manufacturing Manager job description, which in many instances look exactly like the duties of the Lathe Cut Production

20

> Manager. As Manufacturing Manager, I also promoted continuous improvement and the reduction of waste, and took steps to enhance quality assurance in the Standard Lathe Cut area. I also provided insight for the future collective bargaining agreements.

(Gard Decl. (Doc. No. 73-1) at ¶ 34.) Grand River asserts, summarily, that "this contradicts the totality of the deposition wherein questions were asked specifically about Plaintiff's job duties and performance." (Doc. No. 77 at p. 3.)

Grand River's request to strike Paragraph 34 is denied. Grand River does not identify any specific deposition testimony that allegedly contradicts with Gard's Declaration. It is not this Court's role to scour the entirety of Gard's 266-page deposition transcript to locate testimony that potentially contradicts his Declaration. *See, e.g., V&M Star v. Centimark Corp*., 2008 WL 11383394 at * 2 (N.D. Ohio Dec. 19, 2008) ("It is incumbent upon the movant – not the Court—to identify the deficiencies in an affidavit he seeks to have stricken.") Having filed the motion, Grand River bears the burden of identifying specific inconsistencies that it believes exists between Gard's Declaration and his deposition testimony. Grand River has failed to do so and, therefore, its request to strike Paragraph 34 of Gard's Declaration is denied.

For this reason, the Court also rejects Grand River's argument, raised summarily in its Reply Brief, that every paragraph of Gard's Declaration should be stricken. (Doc. No. 86 at p. 4.) Grand River argues that it is not required to identify any specific inconsistencies or contradictions in particular paragraphs because "if Defendant were to go through each paragraphs' inconsistency, surely, Plaintiff would advance the narrative of Defendant being nit-picky to the Court." (*Id.*) Grand River is mistaken. As the movant, it is Grand River's obligation to specifically identify which statements in the affidavit should be stricken and, further, to direct this Court's attention to any potentially contradictory deposition testimony. *See, e.g., Wilson v. Budco*, 762 F.Supp.2d 1047, 1058

21

(E.D. Mich. 2011) ("It is Defendants' obligation to specifically identify which statements in the affidavits should be struck.") (collecting cases). Since Grand River did not fulfill this obligation as to the remaining paragraphs of the Declaration, the Court will not strike them, or any part(s) thereof.

Accordingly, and for all the reasons set forth above, Grand River's Motion to Strike Kent Gard's Declaration (Doc. No. 77) is denied.[15]

## V.    Motion for Summary Judgment (Doc. No.  63)

### A.    ERISA Interference and Retaliation Claims (Count VII)

In Count VII of the Complaint, Gard alleges claims for interference and retaliation under 29 U.S.C. § 1140 (ERISA § 510). (Doc. No. 1 at ¶¶ 66-72.)  Grand River argues that it is entitled to summary judgment in its favor with respect to both of these claims.  (Doc. No. 63 at pp. 15-18.)

Section 510 of ERISA prohibits employers from terminating, or otherwise discriminating against, employees who choose to exercise a benefit to which they are entitled under their employee benefit plan.  *See* 29 U.S.C. § 1140.  Specifically, the statute provides that it is "unlawful for any person to discharge ... or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan[.]" *Id.*  *See also Williams v. Graphic Packaging International, Inc.*, 790 Fed. Appx. 745, 754 (6th Cir. 2019).

---

[15] The Court will not consider Grand River's argument that this Court strike Paragraph 28 of Gard's Declaration, as this argument was raised for the first time in Grand River's Reply.  *See Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (explaining that "reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration") (emphasis in original) (quoting *Novosteel SA v. U.S., Bethlehem Steel Corp.*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)); *Lexicon, Inc. v. Safeco Ins. Co. of Am., Inc.,* 436 F.3d 662, 676 (6th Cir. 2006) (stating that "[i]t is impermissible to mention an issue for the first time in a reply brief because the [opponent] then has no opportunity to respond") (quoting *Knighten v. Commissioner*, 702 F.2d 59, 60 n. 1 (5th Cir. 1983)).

Interpreting this statute, the Sixth Circuit has recognized two different kinds of claims under Section 510: "(1) a 'retaliation' claim where adverse action is taken because a participant availed [him]self of an ERISA right; and (2) an 'interference' claim where adverse action is taken as interference with the attainment of a right under ERISA." *Hamilton v. Starcom Mediavest Grp., Inc.* 522 F.3d 623, 627–28 (6th Cir. 2008). *See also Williams*, 790 Fed. Appx. at 755. The Sixth Circuit has also held that a plaintiff must demonstrate that the defendant had the specific intent to violate ERISA. *See Smith v. Ameritech*, 129 F.3d 857, 865 (6th Cir. 1997).

Where there is no direct evidence that a defendant violated a plaintiff's rights under ERISA, courts employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. *See also Stein v. Atlas Industries, Inc.*, 730 Fed. Appx. 313, 320 (6th Cir. 2018); *Smith v. Hinkle*, 36 Fed. Appx. 825, 828 (6th Cir. 2002). Under that framework, the plaintiff has the initial burden of making a *prima facie* case. *See, e.g., Stein*, 730 Fed. Appx. at 320. If the plaintiff succeeds, the burden shifts back to the defendant to articulate a nondiscriminatory reason for his firing. *Id*. If it does so, the plaintiff must then show that the defendant's proffered reason was, in fact, a pretext for discrimination. *Id.* Here, Gard does not argue there is direct evidence that Grand River violated his rights under ERISA. The Court will, therefore, analyze the parties' arguments under the *McDonnell-Douglas* burden-shifting framework set forth above.

### 1. *Prima Facie* Cases

#### a. ERISA Retaliation Claim

Gard alleges that Grand River fired him in retaliation for enrolling in, and refusing to forfeit coverage under, Grand River's employee health benefit plan. To establish a *prima facie* claim for ERISA retaliation, Gard must show that (1) he engaged in activity that ERISA protects; (2) he

suffered an adverse employment action; and (3) there is a causal link between the protected activity and the employer's adverse action. *See Williams*, 790 Fed. Appx at 755 (citing *Hamilton,* 522 F.3d at 628). In proving the causation prong of the *prima facie* case, Gard must show that Grand River had a specific intent to violate ERISA when it took the action that adversely affected him. *See Hamilton*, 522 F.3d at 628; *Trentham v. Hidden Mountain Resorts, Inc.*, 2010 WL 199959 at * 9 (E.D. Tenn. Jan. 13, 2010). "A plaintiff's burden in establishing *a prima facie* case is not intended to be an onerous one." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1114 (6th Cir. 2001).

It does not appear that the first two elements of Gard's *prima facie* case are at issue. With regard to the first element, Grand River does not contest that its employee health insurance plan is an ERISA plan or that Gard engaged in protected activity by participating in that plan. *See, e.g., Feldmyer v. BarryStaff, Inc.*, 2018 WL 1151776 at * 5 (S.D. Ohio March 5, 2018) (finding that plaintiff's enrollment in defendant's health insurance plan was a protected activity for purposes of establishing *prima facie* ERISA retaliation claim). As for the second element, Grand River does not contest that Gard suffered an adverse employment action when he was terminated in May 2019. *See Hamilton*, 522 F.3d at 629 (noting that plaintiff's termination constituted an adverse employment action). The Court, therefore, finds that the first and second elements of Gard's *prima facie* case are satisfied.

The only remaining issue, therefore, is the third element, i.e., whether there is a causal link between Gard's participation in Grand River's health insurance plan and his termination. For the following reasons, the Court finds that Gard has come forward with sufficient evidence at the summary judgment stage to satisfy this element. Gard has cited evidence that Grand River was

concerned about escalating health care costs generally, and Gard's health care costs in particular.  As set forth above, shortly after Gard returned from his four-month absence in 2017, Chaplin told Gard that he was concerned about "how expensive health care costs were for the company" and stated that he (i.e., Chaplin) "needed to do something to alleviate the recent health care costs."  (Gard Depo. Exh. 4 (Doc. No. 73-3 at PageID# 2839.)  Gard testified that Chaplin also told him that his recent health care expenses, in particular, were "a major contributor to the excessive health care costs the company was exposed to."  (*Id*.)  In August 2017, Chaplin directly asked Gard to consider switching to his wife's health insurance plan. (*Id*.)

Around this same time period, Chaplin expressed concern to Matthew Baird regarding increases in Grand River's health care expenses, and inquired about whether Grand River's stop loss renewal rates would go down if "we take Gard off the plan." (Chaplin Depo. at Tr. 154-155; Chaplin Depo. Exh. 26 (Doc. No. 64-1) at PageID# 662-663.)  Brand also testified that Chaplin explicitly, and repeatedly, told him that he was "really worried" about Grand River's health care costs.  (Brand Depo. at Tr. 78.)  Grand River also communicated its concerns about health care costs to its employees generally.  For example, in 2018, after Grand River switched to MMO, it presented a Power Point to its employees that showed that "Employee Per Year Costs" had increased from $12,519 in 2015 to $16,600 in 2018.  (Brand Depo. Exh. 12 (Doc. No. 64-2 at PageID# 919.))  This Power Point also indicated in large, highlighted text as follows: "Increases too large for company to absorb."  (*Id*.)

Gard also produced evidence that Chaplin made continued efforts to persuade Gard to forfeit his coverage under Grand River's health insurance plan and treated him differently when he declined to do so.  After Gard refused to switch to his wife's insurance, Chaplin communicated with both Baird and Gard in 2018 regarding the possibility of Gard switching to Medicare.  (Chaplin Depo. at Tr.

201-204, 216; Chaplin Depo. Exhs. 33, 36, 37 (Doc. No. 64-1 at PageID#s 679-680, 684-686, 687.))

According to Gard, Chaplin instructed him to meet with Social Security about whether Medicare would cover his kidney condition. (Gard Decl. at ¶ 21.) Not long after Gard advised Chaplin that he would not switch to Medicare, Chaplin assigned projects for the 2019 fiscal year to everyone *except* Gard. (Chaplin Depo. at Tr. 299-300; Chaplin Depo. Exh. 52 (Doc. No. 64-1 at PageID#s 767-769.)) Chaplin terminated Gard's employment several months later, on the grounds that Grand River was "reorganizing." (Gard Depo. at Tr. 201.) Gard has come forward with evidence that, at this time, Chaplin knew that Gard would be needing a kidney transplant. (Brand Decl. at ¶ 13.) Gard has also come forward with evidence that he was the only individual at Grand River to lose his job as a result of the company's reorganization. (Chaplin Depo. at Tr. 292-293; Brand Depo. at Tr. 121-122.)

In a recent case, the Sixth Circuit found similar evidence to be sufficient to satisfy the plaintiff's *prima facie* case. In *Stein v. Atlas Enterprises, Inc*., 730 Fed. Appx. 313 (6th Cir. 2018), Stein's son, Jordan, suffered from a debilitating neurological condition and had to be hospitalized for four months in 2013, "which turned out to be very expensive." *Id*. at 319. Stein argued that his firing was motivated, at least in part, by defendant's "desire to rid itself of Jordan's large medical bills." *Id*. Addressing Stein's ERISA interference and retaliation claims together, the court first found that Stein had satisfied his *prima facie* case, explaining as follows:

> Stein produced evidence sufficient to make a *prima facie* case of both retaliation and interference. Atlas maintains a self-insured employee health-care plan with stop-loss coverage. That means Atlas pays employees' medical claims as they arise—rather than a single fixed premium to an insurance carrier—with a built-in ceiling on how much the company will have to spend on any individual employee. Atlas appears to have spent over $500,000 on Jordan's medical expenses the year before Atlas fired Stein (about half of which was later reimbursed by its stop-loss insurer).
>
> Stein points to evidence suggesting that Atlas was concerned about high health-care costs, and Jordan's in particular. Both before and after Stein's firing, Atlas publicly

26

expressed its worry about "skyrocket[ing]" health-care costs in a series of employee notices. R. 66-11, Pg. ID 1927–32. The company also made significant changes to its health-insurance offerings and stop-loss coverage. While Jordan was hospitalized, Stein says that Atlas's vice-president of operations twice told him that he hoped Jordan would be released soon—because his care was getting expensive for the company. And, around the same time, Atlas's human resources director purportedly told another employee that "astronomical payouts" were causing Atlas's health-insurance costs to go up—and showed the employee a document listing nearly one million dollars in Jordan's medical expenses. [fn omitted]. R. 72-1, Pg. ID 2487. This evidence is sufficient to make Stein's *prima facie* case. *See Smith,* 36 Fed. Appx. at 827–30 (plaintiff made *prima facie* case based partially on fact that supervisor told employee that "families like hers were the cause of [employer's] rising insurance costs and were a drain on the company" (internal quotation marks omitted) ); *see also Trujillo v. PacifiCorp*, 524 F.3d 1149, 1151, 1155–58 (10th Cir. 2008) (plaintiff made *prima facie case* based on one executive's comment that "90% of all healthcare costs were incurred [by] only 10% of the employees" and evidence showing that the employees' son was one of only two covered persons with a terminal illness); *Dewitt v. Proctor Hosp*., 517 F.3d 944, 947–49 (7th Cir. 2008) (plaintiff made *prima facie* case of discrimination where supervisors repeatedly inquired about employee's husband's cancer-treatment costs).

*Id*. at 320-321.[16]

Likewise, here, Grand River has a self-insured employee health insurance plan with stop loss coverage.  While on Grand River's plan, Gard incurred significant health care expenses in 2017 with additional expenses likely to come as a result of Gard's chronic kidney condition and anticipated kidney transplant.  Just as in *Stein*, Gard has come forward with evidence that Grand River repeatedly expressed concern about the company's rising health care costs generally and Gard's costs in particular, with Chaplin twice approaching Gard in an effort to have him forego health insurance under Grand River's plan.  Viewing the evidence in a light most favorable to Gard, the Court finds

---

[16] The Sixth Circuit went on to find that Stein had also come forward with sufficient evidence to establish pretext and reversed the district court's granting of summary judgment in defendant's favor with respect to Stein's ERISA claims. *Id*. at 322-323.

Gard has come forward with sufficient evidence to satisfy the causation element of his *prima facie* case for ERISA retaliation for purposes of summary judgment.

###### b.  ERISA Interference Claim

Gard also alleges that Grand River interfered with his rights under ERISA when it fired him in order to prevent him from using Grand River's health insurance plan to cover the costs of his kidney condition and anticipated kidney transplant.  (Doc. No. 1 at ¶¶ 70-72.)

The *prima facie* elements of an ERISA interference claim require a plaintiff to demonstrate "'(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'"  *Bailey v. U.S. Enrichment Corp*., 530 Fed. Appx 471, 477 (6th Cir. 2013) (quoting *Clark v. Walgreen Co.,* 424 Fed. Appx 467, 474 (6th Cir. 2011)).  *See also Stein*, 730 Fed. Appx. at 319-320 ("To prevail on an interference claim, plaintiff must show that defendant fired him in order to interfere with his ability to receive future benefits . . . under defendant's employee health-care plan.")  The Sixth Circuit has further explained that, to prevail on an interference claim, a plaintiff "is not required to show that the employer's sole purpose" was to interfere with ERISA benefits, but he or she must show that such interference "was a 'motivating factor' in the decision." *Spangler v. E. Ky. Power Coop., Inc*., 790 Fed. Appx. 719, 721 (6th Cir. 2019) (quoting *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992)). Conversely, if the loss of ERISA benefits was a "mere consequence" of an alleged action, then the § 510 claim fails. *See Majewski*, 274 F.3d at 1113.

Grand River does not specifically address any of the *prima facie* elements of this claim, instead arguing generally that it is entitled to summary judgment in its favor because "Plaintiff presents no evidence that there was any interference with an ERISA benefit." (Doc. No. 63 at p. 16.)

Grand River maintains that, to the contrary, Baird's and Chaplin's testimony demonstrate that Grand River cares about its employees' welfare and never attempted to remove an employee from its health insurance plan.[17] (*Id*.) Grand River further asserts that Gard "was not even the highest costing claimant" and that "[o]ther employees had similar conditions or higher costs and were maintained employment." (*Id*. at p. 17.)

Gard argues that he has satisfied the first and third elements of his *prima facie* case because, by terminating him, Grand River prevented his future participation in the company's ERISA health plan. (Doc. No. 71 at p. 16.) As for the second element, Gard argues that he has come forward with sufficient evidence to show that interference was a "motivating factor" in the decision to terminate him. (*Id*.) Specifically, Gard argues that the evidence shows that Chaplin repeatedly expressed concern about rising healthcare expenses; was aware that Gard had chronic kidney issues and would likely need a transplant; and communicated repeatedly with both Baird and Gard about his potential removal from the plan. (*Id*.)

The Court finds that Gard has come forward with sufficient evidence at the summary judgment stage to satisfy the elements of a *prima facie* case of ERISA interference. As an initial matter, Grand River does not contest that Gard has satisfied the first and third elements and, therefore,

---

[17] Specifically, Baird testified that, as a fiduciary, Chaplin "has a duty to make sure the cost [of health care insurance] is as low as possible" and that he and Chaplin look at high-cost claimants to get a sense of risk. (Baird Depo. at Tr. 53-55, 71.) Baird testified that he had never had a discussion with Chaplin about eliminating "any type of person from employment" so as to decrease health care costs to the company. (*Id*. at Tr. 299-300.) Baird further testified that Chaplin never asked him "whether he should force someone off the health care plan." (*Id*.) With regard to Gard in particular, Baird testified that Chaplin was "concerned for Kent, that he was dealing with [kidney] disease, and he wanted to find out what resources were available to him." (*Id*. at Tr. 125, 169-170.) Chaplin testified that he wanted Gard to "get the care that he needed" and that "it didn't matter to me at that point if it was Medicare or not. If he had to have it done, he had to have it done. It wasn't going to affect me really either way." (Chaplin Depo. at Tr. 262.) Chaplin testified that his goal is always to find a health insurance solution that is best for both Grand River and the employee. (*Id*. at Tr. 175-176.)

the Court finds that these elements have been met.  With regard to the second element, the Court finds that Gard has produced evidence from which a reasonable jury could find that Grand River terminated him for the purpose of interfering with his future use of benefits under Grand River's health insurance plan.

As discussed at length above, Gard has come forward with evidence that Chaplin repeatedly expressed concern (to Gard, Brand, Baird, and Grand River's employees generally) about Grand River's rising health care costs.  *See* Gard Depo. Exh. 4 (Doc. No. 73-3 at PageID# 2839; Chaplin Depo. at Tr. 154-156, 187-188; Chaplin Depo. Exh. 26 (Doc. No. 64-1 at PageID# 662); Brand Depo. at Tr. 77-78; Brand Depo. Exh. 12 (Doc. No. 64-2 at PageID# 919).))  Gard also introduced evidence that Chaplin was concerned about Gard's *anticipated* healthcare costs.  Specifically, Gard has cited documentation indicating that, in late 2018 (well after he incurred significant health care costs relating to his heart attack), he continued to be routinely identified by Grand River and/or USI as a "high-cost claimant."  *See* Castle Depo. Exh. 27 (Doc. No. 64-4 at PageID# 1279); Chaplin Depo. Exh. 39 (Doc. No. 64-1 at PageID# 691).  Gard also cites evidence that Chaplin was aware, in late 2018 and 2019, that Gard continued to suffer from chronic kidney disease and that he was going to need a kidney transplant.  *See* Chaplin Depo. at Tr. 202-203 (testifying that, in July 2018, he was aware that Gard's "kidneys were failing again" and that his "condition was getting worse"); Brand Decl. at ¶ 13 (averring that, in early 2019, that Chaplin referenced that Gard was going to have a kidney transplant).  Chaplin also acknowledged that Grand River "would be in better shape" if Gard joined Medicare because "he would no longer be a claimant on the healthcare plan."  (Chaplin Depo. at Tr. 224.)  Chaplin did not assign Gard any projects in January 2019 and terminated his employment three and

a half months later.[18]  Gard was the only managerial employee who was not assigned a project and

he was the only employee who lost his job as a result of Grand River's reorganization.

Viewing the evidence in a light most favorable to Gard, the Court finds there is sufficient

evidence from which a jury could infer that Chaplin terminated Gard for the purpose of interfering

with his future use of ERISA health care benefits.  While Baird and Chaplin testified that this was

not the case, this is a credibility issue that cannot be decided at the summary judgment stage.  Nor is

the Court persuaded by Grand River's argument that Gard failed to demonstrate an improper purpose

because the evidence shows that Gard was not the highest costing claimant in 2018 or 2019.[19]

---

[18] Gard avers that he advised Brand in mid-April 2019 that he elected to accept a Hepatitis-C infected kidney, which he hoped would "speed up the timeframe for me to receive a kidney." (Gard Dec. at ¶ 28.)  Gard maintains that Brand's knowledge of this particular fact can be imputed to Chaplin due to their "many and frequent interactions." (Doc. No. 71 at p. 15, fn 131.) Grand River disagrees, noting that Brand testified in deposition that he did not share this particular piece of information with anyone else at Grand River.  (Doc. No. 78 at pp. 20-21.)  In response, Gard argues that Brand's testimony is "ambiguous" and that, at this stage, "such an inference should be made in Kent's favor." (Doc. No. 81-1 at p. 3.)  The Sixth Circuit has stated (in the context of a Title VII case) that "'knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action.'" *See, e.g., Hicks v. SSP America, Inc.*, 490 Fed. Appx. 781, 785 (6th Cir. 2012).  Here, however, Brand expressly testified that he did not recall sharing the information about Gard's willingness to accept a Hepatitis-C infected kidney with anyone at Grand River.  (Brand Depo. at Tr. 99-100.)  The Court does not find this testimony to be ambiguous.  Brand was asked if he told anyone else at Grand River about this issue and he responded that he did not recall doing so.  Under these circumstances, the Court is not persuaded that Brand's knowledge regarding Gard's willingness to accept a Hepatitis-C infected kidney should be imputed to Chaplin for purposes of the instant motion.

[19] Grand River argues, summarily, that "the MMO documentation highlights that Plaintiff was not a factor in any renewal of the health insurance" and that 'this fact, alone warrants that no pretext exists." (Doc. No. 78 at p. 8.)  *See also* Doc. No. 63 at p. 17.  It is unclear whether Grand River's argument is that the MMO documentation demonstrates Gard has failed to establish his *prima facie* case, pretext, or both.  Regardless, Grand River's argument(s) are without merit because Grand River fails to direct this Court's attention to where the "MMO documentation" is located in the record or explain what, precisely, this "documentation" consists of or how it supports Grand River's argument.  Upon review of the record, the Court notes that Exhibit 5 to Grand River's Motion for Summary Judgment is labelled "Medical Mutual Documents" (Doc. No. 64-5.)  The Court presumes, for purposes of the instant motion, that this Exhibit is the "MMO documentation" to which Grand River refers.  This Exhibit consists of (1) an Affidavit from the custodian of Medical Mutual of Ohio that authenticates "certain records" produced by MMO in response to a subpoena in the underlying action; and (2) over 250 pages of records. (*Id.*) While Grand River argues summarily that this documentation conclusively demonstrates that no pretext exists, it does not point to any specific information or record within the Medical Mutual Documents that allegedly supports this argument.  Nor does Grand River otherwise explain, with any specificity, how this documentation allegedly shows that Gard was "not a factor" in the renewal of Grand River's stop loss insurance.  It is not this Court's function to scour through the entirety of these documents to find information that might support Grand River's argument.  Grand River had every opportunity to explain how this documentation supports its argument but nonetheless failed to do so.

31

Although Gard may not have been the highest costing claimant during those particular years, he has come forward with evidence that (1) he suffered from a chronic and deteriorating condition; (2) he was likely to incur significant health care costs in the near future as a result of his anticipated kidney transplant; and (3) Chaplin was aware of both of these facts and had repeatedly expressed concern about Grand River's escalating health care costs generally and Gard's anticipated health care costs in particular.  The Court finds this sufficient, at the summary judgment stage, to satisfy Gard's *prima facie* case of ERISA interference.  *See, e.g., Stein*, 730 Fed. Appx. at 321 (finding *prima facie* case of ERISA interference met where defendant had expressed concern about rising health care costs and knew that Stein's son's health condition was "permanent and deteriorating").

## 2.    Legitimate Business Reason

As Gard has established his *prima facie* cases of retaliation and interference, the burden shifts to Grand River to provide a legitimate, non-discriminatory business reason for his termination.  Here, Grand River asserts that it terminated Gard because it had decided to "restructure" and "move in a new direction" by hiring one person (i.e., Keith Wyatt as COO) to oversee all product lines.  (Chaplin Depo. at Tr. 267-269; Chaplin Depo. Exh. 51 (Doc. No. 64-1 at PageID# 766.)

Gard argues that Grand River has not satisfied its burden because it has failed to articulate a sufficiently clear and specific non-discriminatory reason for terminating him.  (Doc. No. 71 at p. 26.) In particular, Gard asserts that "when an employer asserts a rationale like a 'reorganization' or 'restructuring,' it must specify why the plaintiff specifically was fired, and the timing thereof."  (*Id*.)

---

The Court, therefore, rejects Grand River's reliance on "the MMO documentation" to demonstrate that it is entitled to summary judgment in its favor.

Gard maintains that Grand River has failed to do so because it has offered no explanation as to why his position, in particular, was the only one that was eliminated as a result of the restructuring. (*Id*.)

The Court disagrees.  In deposition, Chaplin specifically explained why Gard was selected for termination, as follows:

> Q:    Can you tell me why Kent Gard was selected for layoff?
>
> A:    It was a position that we didn't have before, that we had, you know, brought him in to fill, that new structure in the org chart. We were still working with Jason [Brand] and wanted Jason to remain with the company, but there was really no need to have three people overseeing at some level, different levels, but at some level the lathe cut line. Jason had been with us 10 years. He had put in a lot of time and effort and I felt it was worth respecting.
>
> Q:     Who's the third person? Keith Wyatt?
>
> A:     Yes.
>
> Q:    The introduction of Keith Wyatt into the Grand River structure meant that Kent Gard's  position was being eliminated?
>
> A:     Correct.

(Chaplin Depo. at Tr. 267-268.)  Chaplin also testified that this reorganization was, in part, due to the fact that he "wanted to get some more of the mentoring and working with our people in the right direction" and he "didn't feel that Kent had really done an outstanding job in that area and working with Jason." (*Id*. at Tr. 270.)  Chaplin explained that he felt that "these were issues that [Wyatt] could address and had addressed in the past."  (*Id*. at Tr. 273.)

While there is conflicting testimony regarding some of the reasons cited by Chaplin,[20] the Court cannot say, at the summary judgment stage, that Grand River has failed to articulate a

---

[20] For example, while Chaplin testified that the Manufacturing Manager-Lathe Cut position did not previously exist and was created for Gard, Brand disputed this testimony. Brand testified that Gard's position did, in fact, previously exist and had been filled by another employee, Michael Pezo, from 2012 to 2014.  (Brand Depo. at Tr. 23-24, 108-109.)  In addition,

legitimate, non-discriminatory reason for Gard's termination.  Gard's argument to the contrary is rejected.

### 3.      Pretext

The burden next shifts to Gard to demonstrate that Grand River's stated reason for his termination was pretextual.  A plaintiff can establish pretext by showing that the employer's reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, (3) or is insufficient to explain the employer's action.  *Stein*, 730 Fed. Appx at 322.  *See also Smith*, 36 Fed. Appx. at 829.  A plaintiff "'need not show that the employer's sole purpose was to interfere with [his] entitlement to benefits' or to retaliate, but instead that a reasonable jury could find that unlawful considerations were a '*motivating factor'* in its actions." *Stein*, 730 Fed. Appx. at 321-322 (quoting *Smith*, 129 F.3d at 865 (6th Cir. 1997) (ellipses omitted and emphasis added) (quoting *Shahid v. Ford Motor Co*., 76 F.3d 1404, 1411, 1413 (6th Cir. 1996)).  *See also Humphreys*, 966 F.2d at 1043.  As the Sixth Circuit has explained:

> Pretext is a commonsense inquiry: did the employer fire the employee for the stated reason or not? This requires a court to ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is. One can distill the inquiry into a number of component parts, and it can be useful to do so.  But that should not cause one to lose sight of the fact that at bottom the question is always whether the employer made up its stated reason to conceal intentional discrimination. [internal citations omitted] At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation.  If so, her *prima facie* case is sufficient to support an inference of discrimination at trial**.** *Hicks,* 509 U.S. at 511, 113 S. Ct. 2742. But summary judgment is proper if, based on the evidence presented, a jury could not reasonably doubt the employer's explanation. *See Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 148, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000) ("[A]n employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a

---

both Gard and Brand disputed Chaplin's criticisms of Gard's job performance.  (Brand Depo. at Tr. 38, 40-41, 53-54, 58-66, 102-105; Gard Depo. at Tr. 153; Gard Decl. at ¶¶ 5-6.)

weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

*Chen v. Dow Chemical Co*., 580 F.3d 394, fn 4 (6th Cir. 2009).  *See also Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012).

Here, Gard first argues that Grand River's stated reason is pretextual because a reasonable juror could find that it was not the "actual reason" he was terminated.  (Doc. No. 71 at pp. 30-31.) To show that the reasons offered did not "actually motivate" Grand River's decision, Gard must "present evidence 'which tend[s] to prove that an illegal motivation was *more* likely than that offered by defendant.'" *Brennan v. Tractor Supply Co.,* 237 Fed. Appx 9, 20, 2007 WL 1296032 at *9 (6th Cir. 2007) (emphasis in original).  The Sixth Circuit has held that "discriminatory remarks, even by a non-decisionmaker, can serve as probative evidence of pretext." *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009).   Additionally, "an employer's shifting termination rationales are evidence that the proffered rationale may not have been the true motivation for the employer's actions." *Miles v. South Central Human Resource Agency*, 946 F.3d 883, 890 (6th Cir. 2020). *See also Cicero v. Borg-Warner Auto., Inc*., 280 F.3d 579, 592 (6th Cir. 2002) ("Shifting justifications over time calls the credibility of those justifications into question."); *Thurman v. Yellow Freight Sys., Inc*., 90 F.3d 1160, 1167 (6th Cir. 1996) ("An employer's changing rationale for making an adverse employment decision can be evidence of pretext.").

The Court finds that Gard has come forward with sufficient evidence, for purposes of his ERISA claims, to create a genuine issue of material fact as to whether Grand River's stated reasons for terminating him are pretextual.  As discussed at length above, Gard has cited evidence that Chaplin repeatedly made remarks about the high cost of Gard's health care and engaged in numerous,

unsuccessful efforts to persuade Gard to forfeit his coverage under Grand River's health care plan. He has also come forward with evidence that Chaplin was well aware that Gard suffered from chronic kidney issues and was going to need a kidney transplant, thus incurring additional significant health care costs. Shortly after Gard advised Chaplin that he would not switch his health insurance to Medicare, Chaplin did not assign any projects to him, even though there were several projects listed in Gard's own department. This despite the fact that Gard had never previously received any negative feedback, was consistently told that he was doing a good job, and regularly received pay raises and bonuses. Viewed in a light most favorable to Gard, the Court finds the above evidence permits an inference that Grand River was motivated, at least in part, "by its desire to be free from a medical-cost albatross." *Stein*, 730 Fed. Appx. at 322.

This conclusion is further bolstered by evidence that Grand River has offered changing rationales for its decision to terminate Gard's employment. At the time of his termination, Grand River told Gard that he was being terminated solely because the company was restructuring. (Gard Depo. at Tr. 199-201.) Gard testified that Chaplin expressly told him his termination had nothing to do with his job performance and that, in fact, his "performance was excellent." (*Id.* at Tr. 258.) Indeed, in the June 2019 termination letter, Chaplin makes no mention of any concerns with Gard's performance and states only that Gard was being "permanently laid off" because Grand River had "restructured and eliminated" his position. (Chaplin Depo. Exh. 51 (Doc. No. 64-1 at PageID# 766.)) As recently as August 2020, as part of written discovery in the instant action, Grand River again cited restructuring as the reason for Gard's termination, stating that "it was determined that the organization was not moving in the direction it wanted and the created position [i.e., Gard's position] should be

36

eliminated" and that "the company would benefit from a new COO position to oversee all product lines, not just Lathe Cut." (Chaplin Depo. Exh. 48 (Doc. No. 64-1 at PageID# 743-744.))

During his deposition, however, Chaplin testified that he had a number of significant concerns about Gard's job performance. Specifically, Chaplin testified that Gard did not have the respect of the managerial staff reporting to him, had not "really done an outstanding job" in mentoring and working with staff, and had fallen asleep in meetings on several occasions. (*Id.* at Tr. 270, 279, 283, 286-287.) Chaplin initially testified that Gard's allegedly subpar performance did, in fact, play a role in "selecting him for job elimination." (*Id*. at Tr. 274) He then clarified that Gard's performance was not the reason his position was eliminated but, rather, was the reason that Gard was not offered another position in the company after the reorganization (*Id*. at Tr. 274, 279). This "clarification," however, is a distinction without a difference— at bottom, Chaplin testified that Gard's alleged performance issues were, at least in part, the reason that he was no longer employed at Grand River. Sixth Circuit case law is clear that "'[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext,'" particularly where a "performance issue does not come up until well into the litigation." *Gagliotti v. Levin Group, Inc*., 508 Fed. Appx. 476, 481 (6th Cir. 2012) (quoting *Thurman*, 90 F.3d at 1167).

Here, Grand River's changing reasons for terminating Gard, combined with its documented concerns about escalating health care costs and Chaplin's repeated efforts to persuade Gard to switch health care insurers, are sufficient evidence from which a reasonable jury could conclude that Grand River's stated reasons did not "actually motivate" it to terminate Gard's employment. Rather, Gard has come forward with sufficient evidence to permit the inference that Grand River terminated Gard's

employment because he had incurred significant health care costs and was likely to incur significant additional health care costs in the near future as a result of his kidney condition.[21]

Accordingly, and for all the reasons set forth above, Grand River's Motion for Summary Judgment as to Gard's ERISA retaliation and interference claims is denied.[22]

## B.  Age and Disability Discrimination Claims

### 1.  Administrative Exhaustion

Gard also asserts claims of age and disability discrimination and retaliation under state and federal law.  Grand River argues that these claims are time barred because Gard failed to file a charge with the EEOC within the prescribed timeline.  (Doc. No. 63 at pp. 19-20.)  Grand River first appears to assert that Gard's discrimination claims are barred because it is not clear that Gard ever filed an EEOC charge at all.  (Doc. No. 78 at p. 24.)  Grand River next argues that Gard's claims are time barred because he failed to file an EEOC charge within 300 days of Chaplin's August 10, 2017 conversation with Gard in which he asked Gard to consider switching to his wife's insurance.  (Doc. No. 63 at 20; Doc. No. 78 at p. 24.)  Finally, Grand River argues that "any evidence whatsoever of conduct" that falls outside the filing window "is irrelevant as this Court is without jurisdiction for the claim."  (*Id.*)  Gard opposes all three of Grand River's arguments.  (Doc. No. 71 at p. 35.)

---

[21] Gard also argues that Grand River's explanations are pretextual because they have no basis in fact and were insufficient to motivate the termination decision.  (Doc. No. 71 at pp. 31-33.)  Because the Court finds that Gard has come forward with sufficient evidence to establish pretext on the basis that Grand River's stated reasons did not actually motivate it to terminate Gard, the Court need not address these additional arguments.

[22] In its Reply Brief, Grand River argues, for the first time, that Gard has "waived any ERISA claim" because he had Medicare at the time of his February 2020 kidney transplant and he "still, to date, did not list any doctors that changed on him or anything."  (Doc. No. 78 at pp. 21-22.)  Because Gard "most likely . . . benefited from the Medicare coverage," Grand River argues he has waived his ERISA interference and retaliation claims.  (*Id.*)  Grand River cites no legal authority for this argument.  The Court will not consider Grand River's waiver argument because it was raised for the first time in its Reply Brief and is not supported by any legal authority.

As a prerequisite to bringing claims under either the ADA or the ADEA, a claimant must first exhaust his administrative remedies. *See Amini v. Oberlin College*, 259 F.3d 493, 498 (6th Cir. 2001) (noting that requirement to file EEOC charge applies in age discrimination cases); *McGee v. Disney Store*, 53 Fed. Appx. 751, 752 (6th Cir. 2002) (noting that requirement to file EEOC charge applies in ADA cases). *See also Merhulik v. Weltman, Weinberg & Reis Co., LPA*, 2020 WL 7156621 at *4 (N.D. Ohio Dec. 7, 2020) (citing *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 401 (6th Cir. 2008)). A claimant exhausts his administrative remedies by timely filing a charge with the Equal Employment Opportunity Commission ("EEOC"). *See, e.g., Shu-Lien Chang v. Sodexho, Inc.,* 2011 WL 3444239 at *3-4 (N.D. Ohio Aug. 7, 2011). The Sixth Circuit has explained that:

> Usually, if the alleged discrimination occurred more than 180 days prior to the plaintiff's filing of an EEOC charge, claims implicating these actions are barred. However, if the alleged unlawful practice occurs in a 'deferral state,' in this case Ohio, which has enacted its own laws prohibiting discrimination in employment, the plaintiff must file suit within 300 days of the alleged discriminatory act.

*Alexander v. Local 496, Laborers' Int'l Union of N. Am*., 177 F.3d 394, 407 (6th Cir. 1999). *See also Amini*, 259 F.3d at 498; *Skinner v. Bowling Green State University*, 461 F.Supp.3d 667, 672 (N.D. Ohio 2020) (noting that "Ohio is a 'deferral state,' requiring a complaint be filed with the EEOC within 300 days after the allegedly unlawful act"). The same 300-day time limit applies in age discrimination cases brought under the ADEA and in disability discrimination cases brought under the ADA. *See Amini*, 259 F.3d at 498; *Gong v. The Cleveland Clinic Foundation*, 2017 WL 433212 at * 2 (N.D. Ohio Jan. 31, 2017).

The Sixth Circuit has held that the 300-day limitations period does not begin to run on a claim for employment discrimination "until an employer makes and communicates a final decision to the employee." *Amini,* 259 F.3d at 498. *See also Block v. Meharry Medical College*, 723 Fed. Appx.

273, 278 (6th Cir. 2018); *EEOC v. United Parcel Service*, 249 F.3d 557, 561-562 (6th Cir. 2001).

The filing of a timely charge of discrimination, while a condition precedent to suit in federal court, is

not a jurisdictional prerequisite and, similar to a statute of limitations, is subject to waiver, estoppel,

and equitable tolling.  *See National Railroad Passenger Corp. v. Morgan,* 536 U.S. 101, 113 (2002);

*Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982).

As an initial matter, the Court rejects Grand River's argument that Gard's claims are untimely

because he failed to file an EEOC charge.  As discussed *supra*, while Gard testified in his deposition

that he was "not aware of any charge being filed with the EEOC," he subsequently stated that he was

confused by defense counsel's questions and clarified that, if he had been shown his actual EEOC

charge in deposition, he "would have recognized it."  (Gard Decl. at ¶ 32.)  Gard then attaches and

authenticates a signed and notarized copy of his EEOC Charge dated August 25, 2019.  (Doc. No.

73-1 at PageID# 2780.)  In light of the above, the Court is satisfied that Gard did, in fact, file a Charge

with the EEOC.  Grand River's arguments to the contrary are rejected.

The Court also rejects Grand River's argument that Gard's age and disability discrimination

claims are time-barred because he filed his EEOC charge more than 300 days after his August 10,

2017 conversation with Chaplin.  As noted above, the 300-day limitations period does not begin to

run on a discrimination claim "until an employer makes and communicates a **final decision** to the

employee."  *Amini,* 259 F.3d at 498 (emphasis added).  Here, there is no evidence that Chaplin made

or communicated a "final decision" on August 10, 2017.  According to Gard, Chaplin expressed

concern about Gard's health care expenses and asked whether Gard would consider waiving his

insurance with Grand River and switching to his wife's employer's plan.  (Gard Depo. Exh. 4 (Doc.

No. 73-3 at PageID# 2839.)  When Gard declined to do so, Chaplin "ended the conversation by saying

we would stay in touch concerning health care going forward." (*Id.*) Gard continued to work for Grand River (and receive regular pay raises and bonuses) until he was terminated on May 10, 2019. He filed his EEOC Charge 107 days later, on August 25, 2019.

Based on the above, the Court cannot find that Gard's EEOC Charge is untimely. Grand River did not make and communicate a "final decision" about Gard's employment on August 10, 2017. Nor is there any allegation or evidence that Chaplin's conversation with Gard on that date constituted an adverse employment action. *See Block*, 723 Fed. Appx. at 278 ("An adverse employment action requires 'a materially adverse change in the terms and conditions of [a plaintiff's] employment,' such as a 'significant change in employment status' and not including a 'bruised ego.'") (quoting *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010)).

Finally, the Court rejects Grand River's argument that "any evidence whatsoever of conduct before November 29, 2018 [i.e., 300 days before the filing of the August 25, 2019 EEOC charge] is irrelevant" and may not be considered by this Court. (Doc. No. 63 at p. 20.) As noted above, Gard's EEOC Charge was filed within 300 days of his termination and is, therefore, timely. This Court may properly consider evidence regarding Gard's August 10, 2017 conversation with Chaplin as background evidence. *See National R.R. Passenger Corp.*, 536 U.S. at 113 ("Nor does the statute bar an employee from using the prior acts as background evidence in support of a timely claim.")

Accordingly, Grand River's argument that Gard's age and disability discrimination and retaliation claims are time-barred is without merit and rejected.

### 2. Age Discrimination

In Counts I and II, Gard alleges that Grand River discriminated against him on the basis of age when it terminated his employment in May 2019, in violation of the ADEA, 29 U.S.C. § 621, *et*

*seq*, and Ohio law. (Doc. No. 1 at ¶¶ 24-35.) Grand River argues that it is entitled to summary judgment in its favor with respect to both of these claims, asserting (summarily) that "Plaintiff presents no evidence whatsoever that his age had any factor in any decision."[23] (Doc. No. 63 at p. 11.)

The ADEA makes it unlawful for an employer "to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Gard also asserts a claim under Ohio Rev. Code § 4112.02, which provides that it shall be an unlawful discriminatory practice "[f]or any employer, because of the … age . . . of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). Age discrimination claims brought under Ohio law "are 'analyzed under the same standards as federal claims brought under the [ADEA].'" *Blizzard v. Marion Technical College*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Wharton v. Gorman–Rupp Co.*, 309 Fed. Appx. 990, 995 (6th Cir.2009)).

---

[23] Gard argues that Grand River's Motion should be denied because it fails to specifically address any of the *prima facie* elements of Gard's claims and simply asserts, in conclusory fashion, that Grand River is entitled to summary judgment in its favor because Gard has no evidence to prove his case. (Doc. No. 71 at p. 12.) The Court agrees that the legal argument section of Grand River's summary judgment motion relating to Gard's age discrimination claims is neither detailed nor thorough. While Grand River does recite the standard for a *prima facie* case under the ADEA, its entire legal argument with respect to Gard's age discrimination claims consists of two short paragraphs. (Doc. No. 63 at pp. 11-12.) Despite these deficiencies, the Court is not inclined to deny Grand River's motion on this basis. Grand River's Motion and Reply Brief can reasonably be construed as raising the arguments that (1) Gard has failed to demonstrate that he was replaced by Bobby Nelson; and (2) Gard has failed to come forward with sufficient evidence of pretext. Accordingly, the Court will not deny Grand River's Motion on the basis that it is wholly deficient and will proceed to address the arguments that are sufficiently raised by Grand River, below.

"An employee can establish an age discrimination case by either direct or circumstantial evidence." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 410 (6th Cir. 2008). Here, Gard relies on circumstantial evidence of age discrimination. ADEA claims relying on indirect evidence of age discrimination are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020); *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 536 (6th Cir. 2014). As discussed *supra*, under that framework, the plaintiff must first produce "evidence from which a reasonable jury could conclude that he or she established a *prima facie* case of discrimination" before the burden shifts to the employer to offer a legitimate, non-discriminatory reason for the adverse employment action. *See Willard,* 952 F.3d at 807. The plaintiff must then rebut the proffered reason by producing "evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination." *Id. See also Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (citing *McDonnell Douglas*, 411 U.S. at 802.) As the Sixth Circuit recently explained:

> As we have clarified before, the *McDonnell Douglas* burden-shifting framework allocates "the burden of production and [provides] an order for the presentation of proof in [employment discrimination] cases." *Provenzano*, 663 F.3d at 812 (last alteration in original) (emphasis added) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 659 (6th Cir. 2000)). Thus, at the first stage of the burden-shifting framework, we do not ask whether a jury could conclude that the plaintiff has proven its *prima facie* case by preponderant evidence, but rather whether "a reasonable jury could conclude that a *prima facie* case of discrimination has been established." *Provenzano,* 663 F.3d at 812 (quoting *Macy v. Hopkins Cty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007)). At the pretext stage, the plaintiff's burden of production "merges" with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination. *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

*Willard*, 952 F.3d at 807.

### a. *Prima Facie* Case

To establish a *prima facie* case of age discrimination, Gard must show that (1) he was a member of a protected class (older than 40 years old); (2) he suffered an adverse employment action; (3) he was qualified for the position held; and (4) he was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably. *See Pelcha v. MW Bancorp., Inc.,* 988 F.3d 318, 326 (6th Cir. 2021); *Geiger v. Tower Auto.*, 579 F.3d 614, 622–23 (6th Cir. 2009). "This light burden is 'easily met' and 'not onerous.'" *Pelcha*, 988 F.3d at 326 (quoting *Willard*, 952 F.3d at 808 (6th Cir. 2020) (quoting *Provenzano*, 663 F.3d at 813).

The first three elements of Gard's *prima facie* case are satisfied. Gard was a member of the protected class because he was over the age of forty, and his termination constitutes an adverse employment action. Moreover, Grand River does not dispute (and, indeed, Chaplin expressly acknowledged in deposition) that Gard was qualified for the position of Manufacturing Manager— Lathe Cut Division. (Chaplin Depo. at Tr. 110.) Thus, the only issue is whether Gard has satisfied the fourth factor, i.e., that he was replaced by someone outside of the protected class or similarly situated non-protected employees were treated more favorably.

Gard argues that, after his termination, he was replaced by Brand and, later, by Bobby Nelson, both of whom (he asserts) are substantially younger than him. (Doc. No. 71 at p. 20.) Specifically, Gard maintains that, after his termination, Brand was reassigned to take over his job duties while Wyatt assumed Brand's responsibilities. (*Id*. at p. 21.) Citing *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014), Gard asserts that Brand "replaced" him as a matter of law because he (Brand) did not merely assume Gard's responsibilities in addition to his other functions. (*Id*.) Rather, Brand assumed Gard's responsibilities, forfeited his own previous responsibilities for managing the Drum & Pail Division and Project Engineering Manager to Wyatt, and ceased reporting

44

directly to Chaplin. (*Id.*) Based on the above, Gard argues that a jury could reasonably conclude that Brand replaced Gard. (*Id.*) Gard further asserts that he was "ultimately replaced" by Nelson, arguing that Grand River "did not complete the replacement process until it pushed out Brand, seven months after firing [Gard], and reassigned Nelson to manage the SLC division." (*Id.* at p 22.)

Grand River fails to either acknowledge or address, at any point in its Motion or Reply Brief, Gard's argument that he was initially replaced by Brand. *See* Doc. No. 63 at pp. 11-12; Doc. No. 78 at 15-17. Specifically, Grand River does not address Gard's discussion of *Pierson* nor does it direct this Court's attention to any evidence to refute Gard's argument that, after he was terminated, Brand assumed Gard's job responsibilities, forfeited his own previous job responsibilities, and began reporting to Wyatt rather than to Chaplin. (*Id.*) Rather, Grand River devotes the majority of its Reply Brief to responding to Gard's arguments regarding Bobby Nelson, asserting that Nelson assumed an entirely different managerial position after Brand retired and did not replace Gard. (*Id.*)

In *Pierson*, the Sixth Circuit held that an employer "'replaces' a discharged employee when it reassigns an existing employee to assume the discharged employee's duties in a way that 'fundamentally change[s] the nature of his employment.'" *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 537 (6th Cir. 2014) (quoting *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 522 (6th Cir. 1997)). *See also Lewis v. City of Detroit*, 702 Fed. Appx. 274, 281 (6th Cir. 2017). An employer that spreads the former duties of a terminated employee among remaining employees "does not constitute replacement." *Pierson*, 749 F.3d at 537 (citing *Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992)). *See also Barnes v. GenCorp, Inc.*, 896 F.2d 1457, 1465 (6th Cir.1990) ("A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.").

45

In the instant case, the question of whether Brand "replaced" Gard is a close one.  While Gard has come forward with evidence that Brand assumed Gard's responsibilities for managing the Standard Lathe Cut and Secondary Operations Divisions and no longer supervised the managers of the Project Engineering and the Drum & Pail Divisions, the record also appears to contain evidence that Brand retained some of his previous supervisory responsibilities with regard to the White Lathe Cut/Sweeper Belt Cell and Maintenance Divisions, as well as his job title.  (Chaplin Depo. Exh. 62 (Doc. No. 64-1 at PageID# 811); Chaplin Depo. at Tr. 343.)  The Sixth Circuit has suggested, in an unreported decision, that an individual does not "replace" an employee where that individual retains his or her previous job responsibilities.  *See Hannon v. Louisiana-Pacific Corp*., 784 Fed. Appx. 444, 449 (6th Cir. 2019) ("We have defined 'replaced' narrowly—a 'replacement' must more or less perform *all* of a plaintiff's former duties and *only* the plaintiff's former duties.") (emphasis in original). Neither party acknowledges or addresses this issue in their briefing.

However, even assuming *arguendo* that Brand (and/or Nelson) "replaced" Gard,[24] the Court finds, for the reasons set forth below, that Grand River is nonetheless entitled to summary judgment in its favor because Gard has failed to demonstrate that age was the but-for cause of his termination.

As Grand River has sufficiently articulated a legitimate, non-discriminatory reason for Gard's termination, the burden shifts to Gard to "demonstrate pretext and that he can meet his burden of

---

[24] Grand River does not contest that Brand is "significantly younger" than Gard.  *See Willard*, 952 F.3d at 808 ("To raise an inference of discrimination, Willard need only point to employees who are significantly younger than he is.")  The Sixth Circuit has found that an age difference of ten or more years is significant whereas a difference of less than six years is not.  *Id*.  *See also Blizzrd v. Marion Technical College*, 698 F.3d 275, 284 (6th Cir. 2012); *Grosjean v. First Energy Corp*., 349 F.3d 332, 336 (6th Cir. 2003).  Here, Gard was sixty-six (66) years old at the time he was terminated. (Gard Decl. at ¶ 1.)  Brand was forty-four (44) years old.  (Brand Depo. at Tr. 7.)  As Brand was more than ten years younger than Gard, the Court finds that Brand was "significantly younger" than Gard for purposes of establishing his *prima facie* case under the ADA.

46

persuasion."[25] *See Willard*, 952 F.3d at 810. "At the pretext stage, the plaintiff's burden of production 'merges' with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination." *Willard*, 952 F.3d at 807. *See also Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 177 (2009). Meeting this causation requirement "is no simple task." *Pelcha*, 988 F.3d at 323. It requires a plaintiff to show, by a preponderance of the evidence, that "age was the determinative reason they were terminated; that is, they must show 'that age was the 'reason' that the employer decided to act.'" *Id.* at 323-324 (quoting *Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 529 (6th Cir. 2014)). Stated differently, a plaintiff must show that "age '*had a determinative influence on the outcome*' of the employer's decision-making process." *Pelcha,* 988 F.3d at 324 (quoting *Gross*, 557 U.S. at 176) (emphasis in original). *See also Sloat v. Hewlitt-Packard*, 18 F.4th 204, 209 (6th Cir. 2021).

Here, Gard argues, at length, that Grand River's stated reason for terminating him was pretextual. (Doc. No. 71 at pp. 27-33.) In particular, and as discussed *supra*, Gard principally asserts that pretext is demonstrated by (1) Chaplin's repeated remarks expressing concern about the escalating health care costs generally and the cost of Gard's health care in particular; (2) Chaplin's numerous, unsuccessful efforts to persuade Gard to forfeit his coverage under Grand River's health care plan; and (3) Grand River's shifting rationales for terminating him. (*Id.*) The Court has found that this evidence is sufficient to create a genuine issue of material fact regarding pretext for purposes of Gard's ERISA claims because it permits the inference that Grand River terminated Gard's

---

[25] "An employee may show that an employer's proffered reason for terminating him was pretext by demonstrating 'that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Pierson*, 749 F.3d at 539 (quoting *Wexler v. White's Fine Furniture*, 317 F.3d 564, 576 (6th Cir. 2003)).

employment because he had incurred significant health care costs and was likely to incur significant additional health care costs in the near future as a result of his kidney condition.

This does not, however, answer the question of whether Gard has come forward with sufficient evidence to demonstrate that he was terminated because of his *age.*  (*Id.*)  Gard does not address, at any point in his extensive briefing, that "[a]t the pretext stage, [his] burden of production 'merges' with his ultimate burden of persuasion to show that age discrimination was the but-for cause of his termination." *Willard*, 952 F.3d at 807.  *See also Gross*, 557 U.S. at 177.  Upon review, it appears to this Court that only one sentence of Gard's discussion regarding pretext is devoted specifically to age.  (Doc. No. 71 at pp. 30-31.)  Gard states that "Chaplin also asked Kent for a retirement date and repeatedly associated Kent with 'Medicare-eligibility,' a direct reference to his age." (*Id.*)  In response, Grand River argues that "age was never a factor in anything with Plaintiff." (Doc. No. 78 at p. 17.)

Gard directs the Court to the following evidence in support of his argument. In his Declaration, Gard asserts that: "Around January or February of 2019, Chaplin approached me and asked me very specifically whether I had a retirement date set, or words to that effect.  I told Chaplin that I planned on working as long as I was able to physically and mentally contribute." (Gard Decl. at ¶ 26.)  Lisa Castle noted in a document that Gard was "Medicare eligible 2017" and explained in deposition that "because of Kent's age, there was an option that he could exit the health care plan." (Castle Depo. at Tr. 117-118; Castle Depo. Exh. 13 (Doc. No. 64-4 at PageID# 1241.))  Matthew Baird testified that the reference to Gard as "Medicare eligible 2017" was relevant because: "I guess there was a possibility he could be going on Medicare for one of two reasons.  The end-stage renal [disease], which we pretty much determined was not going to happen, but he had also attained the

48

age of 65, I believe." (Baird Depo. at Tr. 202-203.)  Gard does not cite any Sixth Circuit authority (or any federal law, for that matter) supporting the proposition that this evidence, standing alone, is sufficient to show that "age '*had a determinative influence on the outcome'* of the employer's decision-making process." *Pelcha,* 988 F.3d at 324 (quoting *Gross*, 557 U.S. at 176) (emphasis in original).

For the following reasons, the Court finds that it is not.  "To be sufficiently demonstrative of age discrimination, oral or written statements must be: (1) made by a decision-maker or by an agent acting within the scope of his or her employment; (2) related to the decision-making (termination) process; (3) more than merely 'vague, ambiguous, or isolated;' and (4) made proximate in time to the act of termination." *Hannon v. Louisiana- Pacific Corp*., 784 Fed. Appx. 444, 448 (6th Cir. 2019) (quoting *Diebel v. L & H. Res., LLC*, 492 Fed. Appx 523, 527 (6th Cir. 2012)).  The Court begins with the evidence relating to Castle and Baird.  It is undisputed that neither of these individuals were the "decision maker" when it came to Gard's termination.  Moreover, Gard has not directed this Court's attention to any evidence that Castle's characterization of Gard as "Medicare eligible 2017" was made "proximate in time" to his termination in May 2019.  Indeed, Castle expressly testified that she did not know when she made the notation that Gard was "Medicare eligible 2017" or when the document containing that notation was created.  (Castle Depo. at Tr. 80.)  Further, Gard has not sufficiently or persuasively articulated how Castle's reference to Gard as "Medicare eligible 2017" at some indeterminate point in time was "related to the decision-making process."  Rather, the Court finds that Castle's reference to Gard as "Medicare eligible" is ambiguous, since (depending on the time Castle made this notation) it could have referred to the possibility that Gard was eligible for Medicare due to ESRD or it could have referred to the fact that Gard was eligible for Medicare in

49

2017 due to his age.  Indeed, Baird himself testified that there were two possible reasons that Gard might be eligible for Medicare.  Without knowing when Castle made this notation, it is not possible to determine which of these two reasons she might have been referring to.  Thus, the Court finds that Gard has failed to demonstrate that the evidence relating to Castle and Baird is sufficient to demonstrate that his age was the but-for cause of his termination.

This leaves Gard's testimony that, on one occasion in January or February 2019, Chaplin asked him whether he "had a retirement date."  With regard to the first and fourth factors considered by the Sixth Circuit, Chaplin was indeed the decision-maker with respect to Gard's termination and his question about Gard's retirement date was arguably "proximate in time" to Gard's May 2019 termination.  The Court is not convinced, however, that evidence that Chaplin asked Gard about retirement on one occasion is sufficient to show that Gard's age was the but-for cause of his termination.  While "[r]etirement is obviously a concept closely associated with being older," the Court finds that Chaplin's single inquiry about Gard's retirement plans is too isolated to show, by a preponderance of the evidence, that Gard was terminated because of his age.  *Sloat*, 18 F.4th at 211. The Sixth Circuit has generally required more than a single reference to retirement to show but-for causation.  For example, in *Sloat*, the plaintiff came forward with evidence that his supervisor, Hagler, asked him about retirement on at least ten occasions.  *Id*.  The court found that the fact "that Hagler repeatedly badgered Sloat about retirement . . . would allow a jury to infer that the *reason* Hagler had prejudged Sloat's capabilities was that Hagler thought he was too old for the job."  *Id*. (emphasis in original.)  Similarly, in *Willard*, the court found that the plaintiff had come forward with sufficient evidence of pretext where his supervisors made numerous ageist remarks, including asking plaintiff about retirement, describing him as "old and fat" and an "over the hill" salesman, and stating that

50

plaintiff was "too old to sit at a front desk" and that a younger salesperson should sit there instead. *Willard*, 952 F.3d at 813.

Here, by contrast, Gard has come forward with evidence that Chaplin asked him about retirement on a single occasion and has not identified any other evidence of age-related bias or that that age was a factor in the decision-making process.  Under these circumstances, the Court finds that Gard has failed to demonstrate that age "had a determinative influence on the outcome" of Grand River's decision-making process.  *Pelcha,* 988 F.3d at 324.  *See also Sloat*, 18 F.4th at 211 (noting that "one or two inquiries" about retirement may be "dismissed as isolated.")  Accordingly, and for all the reasons set forth above, the Court finds that Grand River is entitled to summary judgment in its favor with respect to Gard's federal and state age discrimination claims.

### 3.        Disability Discrimination

In Counts III and IV of the Complaint, Gard alleges claims for disability discrimination under the ADA and Ohio Revised Code § 4112.02.  (Doc. No. 1 at ¶¶ 34-51.)  In both claims, Gard alleges that he (1) was actually disabled, had a record of disability, and/or was regarded as disabled under federal and state law; (2) he is an otherwise qualified individual who was able to perform the essential functions of his job with or without accommodation; (3) Grand River was aware of his disability; and (4) Grand River "discriminated against [him] because of his disability by terminating his employment and replacing him with a non-disabled individual and/or by otherwise discriminating against him in the terms, privileges, and conditions of employment." (*Id*.)

In its Motion, Grand River recites the legal standard governing disability discrimination and failure to accommodate claims but then provides virtually no argument applying that law to the facts of the instant case.  (Doc. No. 63 at pp. 12-15.)  Indeed, aside from setting forth the standard, the

entirety of Grand River's legal argument with respect to Gard's federal and state disability discrimination claims consists of the following five sentences:

> Not a single piece of evidence has been produced to show that any adverse employment action was taken against Plaintiff based upon a claimed disability. Even Jason Brand did not perceive Plaintiff as having a disability.  Ric Selip confirms that any employment termination had nothing to do with any health concerns.  ***
>
> Lisa Castle additionally confirms that nothing was submitted for any disability accommodation.  Jason Brand states the same as well.  Based upon the complete lack of evidence, the claim must fail.

(Doc. No. 63 at 12, 14-15.)

Gard argues that Grand River's Motion should be denied with respect to these claims because it is entirely conclusory.  (Doc. No.  71 at p. 12.)  Specifically, Gard maintains that Grand River's Motion fails to "meet the basic, summary judgment movant's burden to show 'clearly and convincingly' that there is no genuine dispute of material fact."  (*Id.*)  He asserts that, at most, Grand River "makes passing references to the issue of pretext – but then it just broadly states that Gard has no evidence," leaving Gard to speculate as to the specific grounds for Grand River's Motion.  (*Id.*)  Gard further maintains that Grand River's Motion is deficient because it "revolves entirely around a failure-to-accommodate claim that Plaintiff never pled."  (*Id.* at pp. 12-13.)

In Reply, Grand River does not address Gard's argument that its summary judgment motion should be denied as conclusory.  (Doc. No. 78.)

The Court agrees that Grand River's Motion with respect to Gard's disability discrimination claims is wholly deficient. As an initial matter, the Complaint does not set forth a failure to accommodate claim under the ADA.  Therefore, Grand River's assertion that Castle and Brand confirmed that Gard never requested an accommodation is not relevant.  The only remaining argument advanced by Grand River in its Motion, therefore, consists of Grand River's conclusory

assertions that "[n]ot a single piece of evidence has been produced to show that any adverse action was taken against [Gard] based upon a claimed disability;" Jason Brand did not perceive Gard as having a disability; and Board Member Ric Selip confirms that "any employment termination had nothing to do with any health concerns."  (Doc. No. 63 at p. 12.)  Grand River does not direct this Court's attention to any specific deposition testimony or evidence in support of any of these assertions nor does it make any effort to apply the law to the alleged facts in this case.

"It is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp v. Catrett*, 477 U.S. 317, 328 (1986) (White, J., concurring).  Courts in this Circuit have denied summary judgment motions where the movant fails to support its motion with developed legal argument or citation to the record.  *See, e.g., Snap-on Business Solutions, Inc. v. O'Neil & Associates, Inc.,* 708 F.Supp.2d 669, 686-687 (N.D. Ohio 2010) (denying summary judgment motion on trade secrets claim on the grounds that defendant's motion was "woefully insufficient" and failed "to make at least some affirmative showing as to how the record or law entitles it to summary judgment"); *Hicks v. Smith*, 2017 WL 5633276 (W.D. Ky. Nov. 22, 2017) (denying plaintiff's summary judgment motion on the grounds that it was conclusory and failed to cite to the record).

Here, Grand River has failed to either articulate any clear legal argument, or cite to any specific evidence in the record, in support of this section of its Motion, leaving the Court at a loss as to the grounds upon which Grand River bases its Motion.  Given Grand River's complete failure to articulate the legal or factual basis for its Motion, the Court is compelled to deny Grand River's Motion with respect to Gard's federal and state disability discrimination claims.

### 4.    Retaliation Claims

In Counts V and VI of his Complaint, Gard alleges claims for retaliation under the ADA and Ohio Rev. Code § 4112.02.  (Doc. No. 1 at ¶¶ 52-58, 59-64.)  In these claims, Gard alleges that he "requested accommodations for his disabilities, including but not limited to seeking leave to undergo a kidney transplant" and that his "request for accommodations" constitutes activity protected under federal and state law.  (*Id.*)  Gard alleges that, Grand River retaliated against him because of his protected activity when it terminated his employment in May 2019.  (*Id.*)

Aside from setting forth the standard for a *prima facie* case, the entirety of Grand River's Motion with respect to this claim consists of two sentences.  (Doc. No. 63 at p. 15.)  Specifically, the sum total of Grand River's argument is as follows: "Plaintiff has failed to provide any evidence to meet the *prima facie* showing necessary, therefore, this claim must be dismissed with prejudice. Since the underlying disability and age discrimination claims fail to create a genuine issue of material fact, this claim also fails." (*Id.*)

Grand River's Motion is wholly deficient.  As noted *supra*, "[i]t is not enough to move for summary judgment without supporting the motion in any way or with a conclusory assertion that the plaintiff has no evidence to prove his case." *Celotex Corp*, 477 U.S. at 328 (White, J., concurring). Grand River fails entirely to support this section of its summary judgment motion with any citation to the record or legal argument applying the law to the facts of the instant case.  Accordingly, Grand River's Motion is denied with respect to Gard's state and federal retaliation claims.

### C.    Punitive Damages

Lastly, Grand River argues that it is entitled to summary judgment in its favor with respect to Gard's request for punitive damages.  (Doc. No. 63 at pp. 18-19.)  Grand River asserts that Gard has not identified any evidence sufficient to support such an award and notes that Gard himself testified

that he was not aware of any hatred, ill will, or revenge towards him by Grand River.  (*Id.*)  Gard argues that issues of fact prevent summary judgment on his claims for punitive damages under the ADA and Ohio law.  (Doc. No. 71 at pp. 33-34.)

The ADA permits an award of punitive damages "if the complaining party demonstrates that the [employer] engaged in a discriminatory practice ... with malice or with reckless indifference to [his] federally protected rights." 42 U.S.C. § 1981a(a)(2) & (b)(1).  *See also Bates v. Dura Automotive Systems, Inc.*, 767 F.3d 566, 582-583 (6th Cir. 2014).  "The terms 'malice' or 'reckless indifference' pertain to the employer's knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." *Id.* (quoting *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535 (1999)).  To be liable for punitive damages, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law." *Id.* (quoting *Kolstad*, 527 U.S. at 536). "Employers who are simply 'unaware of the relevant federal prohibition' or believe that the discrimination is lawful are not subject to punitive damages liability." *Preferred Props., Inc. v. Indian River Estates, Inc.*, 276 F.3d 790, 799 (6th Cir. 2002) (quoting *Kolstad*, 527 U.S. at 536–37).

In addition, the parties do not dispute that punitive damages are available under Ohio law with respect to Gard's age and disability discrimination and retaliation claims. To receive punitive damages, Ohio law requires a Plaintiff to prove by clear and convincing evidence that the defendant possessed "actual malice." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501 (6th Cir. 2016) (citing *Preston v. Murty*, 32 Ohio St.3d 334, 512 N.E.2d 1174, 1175 (Ohio 1987)). "[A]ctual malice ... is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great

probability of causing substantial harm." *Id.* (quoting *Preston*, 512 N.E.2d at 1176). *See also Siwik v. Cleveland Clinic Foundation,* 2019 WL 1040861 at * 28-29 (N.D. Ohio March 5, 2019).

Here, Grand River argues that Gard is not entitled to punitive damages, citing (1) Chaplin's testimony that he had no "ill will" against Gard; (2) Baird's testimony that Chaplin cared about the health and welfare of all of its employees, including Gard; and (3) Gard's own testimony that he was not aware of any hatred, ill will, or revenge on behalf of Grand River. (Doc. No. 63 at pp. 18-19; Doc. No. 78 at pp. 23-24.) In response, Gard argues that there is ample evidence from which a jury could conclude that Grand River consciously disregarded his rights. (Doc. No. 71 at p. 34.) Gard asserts that:

> [Grand River] consciously disregarded Kent's rights by first failing to investigate Kent's complaint about Chaplin's coercion, in violation of its own policy. Chaplin then ignored Brand's admonition to "let sleeping dogs lie." [Grand River] and USI witnesses all testified that, if true, they know that Chaplin's conduct was inappropriate and wrong. Then, Brand was pushed out of his position after supporting Kent, and [Grand River] threatened Brand with a lawsuit to silence him.

(*Id.*)

The Court finds that the parties have brought forward conflicting evidence indicating the existence of a genuine issue of material fact as to whether Grand River acted with malice or reckless indifference as to Gard's rights under the ADA and state law. Accordingly, Grand River's Motion for Summary Judgment as to punitive damages is denied.

## VI. Conclusion

For all the reasons set forth above, Defendant's Motion to Strike (Doc. No. 77) is DENIED. Defendant's Motion for Summary Judgment (Doc. No. 63) is GRANTED IN PART and DENIED IN PART, as follows. Grand River's Motion is GRANTED with respect to Gard's age discrimination claims under the ADEA and Ohio law (Counts I and II). Grand River's Motion is DENIED with

respect to Gard's claims for disability discrimination under the ADA and Ohio law (Counts III and IV), retaliation under the ADA and Ohio law (Counts V and VI), ERISA interference and retaliation (Count VII), and punitive damages.

**IT IS SO ORDERED.**

    *s/Pamela A. Barker*
    PAMELA A. BARKER

Date: December 20, 2021            U. S. DISTRICT JUDGE